# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| RANI BOLTON, ALISON MERCKER, JAMES ARMSTRONG, MELISSA SUTER, and BENJAMIN LYMAN, individually and as representatives of a class of participants and beneficiaries on behalf of the INLAND FRESH SEAFOOD CORPORATION OF AMERICA, INC. EMPLOYEE STOCK OWNERSHIP PLAN, | Civil Action No. |
| | COMPLAINT—CLASS ACTION |
| | JURY TRIAL DEMANDED |
| *Plaintiffs*, | |
| v. | |
| INLAND FRESH SEAFOOD CORPORATION OF AMERICA, INC., JOEL KNOX, BILL DEMMOND, CHRIS ROSENBERGER, LES SCHNEIDER, JAMES R. URBACH, and the INLAND FRESH SEAFOOD CORPORATION OF AMERICA, INC. ESOP COMMITTEE, | |
| *Defendants*. | |

## COMPLAINT

1.     Plaintiffs Rani Bolton, Alison Mercker, James Armstrong, Melissa Suter, and Benjamin Lyman, individually and as representatives of a class of  participants and beneficiaries in the Inland Fresh Seafood

Corporation of America, Inc. Employee Stock Ownership Plan (the "Plan"),
bring this action under 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1132(a)(3)(B)
on behalf of the Plan against Defendants Inland Fresh Seafood Corporation
of America, Inc. ("Inland Fresh" or the "Company"), Joel Knox, Bill
Demmond, Chris Rosenberger, Les Schneider, James R. Urbach, and the
Inland Fresh Seafood Corporation of America, Inc. ESOP Committee
(collectively, "Defendants") for breaches of fiduciary duties under ERISA.[1]

2.     As Plan fiduciaries, Defendants are obligated to act for the
exclusive benefit of Plan participants and beneficiaries. These duties "are the
highest known to the law." *Fuller v. Suntrust Banks, Inc.,* 744 F.3d 685, 695
(11th Cir. 2014); 29 U.S.C. § 1104(a). Instead of acting in the exclusive best
interests of participants, Defendants caused Inland Fresh shares to be sold to
the Plan (the "Transaction") for a price far in excess of their fair market
value, in an act of blatant self-dealing.

3.     The Transaction allowed the selling shareholders, i.e.,
Defendants Joel Knox, Bill Demmond, Chris Rosenberger, and Les Schneider
(the "Selling Shareholders"), to enrich themselves at the expense of the Plan,
contrary to the interests of Plan participants and beneficiaries, and contrary

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461.

to Defendants' duties as ERISA fiduciaries.

4.     Even if the Selling Shareholders were not ERISA fiduciaries – which they were – they are nonetheless required to disgorge their ill-gotten gains to the Plan as parties-in-interest who were knowing participants in a breach of ERISA's fiduciary duties and who violated ERISA's prohibitions on self-dealing transactions.

5.     Trustee James R. Urbach failed to fulfill his ERISA duties, as Trustee and fiduciary, to the Plan and its participants, including Plaintiffs, by knowingly allowing the Transaction to occur, without appropriate due diligence.

6.     To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plan, bring this action on behalf of the Plans under 29 U.S.C. § 1132(a)(2) to enforce Defendants' personal liability under 29 U.S.C. § 1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan any profits made through Defendants' use of the Plan's assets, and under 29 U.S.C. § 1132(a)(3)(B) to obtain disgorgement of ill-gotten gains by non-fiduciaries who knowingly benefited from fiduciary breaches and prohibited transactions. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

7.    **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1132(a)(3)(B).

8.    **Venue.** This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the District in which the subject Plan is administered, where at least one of the alleged breaches took place, and where the Defendants reside or may be found.

9.    **Standing.** An action under 29 U.S.C. § 1132 allows recovery only for a plan, and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id.* at 254. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29 U.S.C. § 1132(a)(2). As explained in detail below, the Plans suffered millions of dollars in losses caused by Defendants' fiduciary breaches and remain exposed to harm and continued future losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury

even though section 1132(a)(2) does not provide redress for individual injuries, each Plaintiff has suffered such an injury, because each suffered financial harm as a result of the Transaction.

## PARTIES

### I.    The Plan

10.    The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(34).

11.    The Plan is established and maintained under a written document pursuant to 29 U.S.C. § 1102(a)(1).

12.    The Plan was established on March 27, 2016.

13.    The Plan operates as a leveraged employee stock ownership plan.

14.    The Plan provides for retirement income for employees of Inland Fresh. That retirement income depends upon contributions made on behalf of each employee by his or her employer, and from the performance of investments net of fees and expenses.

15.     Employees who work at Inland Fresh as well as its participating subsidiaries are generally eligible to participate in the Plan after they have completed 1,000 hours of service within a 12-month period and are at least 21 years old. Employees are not allowed to make contributions to their accounts.

16.    Employees are "vested," i.e., entitled to receive benefits, based on

their service time. Employees are 20% vested after 2 years of service, 40% vested after 3 years, 60% vested after 4 years of service, 80% vested after 5 years of service, and 100% vested after 6 years of service. Participants who worked at Inland Fresh for five years prior to the Transaction received additional vesting based on their years of prior service.

17.    On November 26, 2016, the Plan purchased 100,000 shares of Inland Fresh common stock using the proceeds of a loan guaranteed by the company (i.e., the Transaction). The Plan holds the common stock in a trust established under the Plan. The borrowing is to be repaid over a period of thirty years via contributions to a trust fund.

18.    In 2016, the Plan entered into a $92,000,000 term loan agreement with Inland Fresh. The proceeds of the loan were used to purchase Inland Fresh common stock. Unallocated shares are collateral for the loan. Shares are released from collateral and allocated to participants when principal and interest payments are made. The number of shares released in any year is the number of shares held as collateral, multiplied by the ratio of the current year payments, divided by the total of the year's payments, plus all future years' principal and interest payment.

19.    Defendants controlled and directed the terms of the Transaction.

20.    As of March 27, 2020, the Plan had 578 participants with account

balances.  According to the Plan's Form 5500 filed with the U.S. Department of Labor, its assets were at a net deficit, including both allocated and unallocated shares, of $49,580,581.

## II.    Plaintiffs

21.    Rani Bolton is a former Project Manager at Inland Fresh, and resides in Dunwoody, Georgia. She is a participant in the Plan under 29 U.S.C. § 1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

22.    Alison Mercker is a former Regional Sales Executive at Inland Fresh and resides in Tucker, Georgia. She is a participant in the Plan under 29 U.S.C. § 1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

23.    James Armstrong is a former Sales Executive at Inland Fresh and resides in Guntersville, Alabama. He is a participant in the Plan under 29 U.S.C. § 1002(7) because he and his beneficiaries are eligible to receive benefits under the Plan.

24.    Melissa Suter is a former Sales Representative at Inland Fresh and resides in Avondale Estates, Georgia. She is a participant in the Plan under 29 U.S.C. § 1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

25.     Benjamin Lyman is a former Operations Manager at Inland Fresh and resides in Tucker, Georgia. He was a participant in the Plan until 2021.

**III.  Defendants**

26.     Inland Fresh is a domestic corporation organized under Georgia law with its principal place of business in Tucker, Georgia. Inland Fresh is the plan sponsor, and is responsible for the administration and management of the Plan.

27.     Inland Fresh acts through its Board of Directors, which has appointed the ESOP Committee to act as its agent in performing Plan administration and management. Inland Fresh is a fiduciary because it exercises "discretionary authority [and] discretionary control respecting management" of the Plan and exercises "authority [and] control respecting management or disposition of its assets[.]" 29 U.S.C. § 1002(21)(A). The ESOP Committee is the named fiduciary, pursuant to 29 U.S.C. § 1102(a), and the Plan administrator under 29 U.S.C. § 1002(16)(A)(i) with responsibility and authority to control the operation, management, and administration of the Plan.

28.     Joel Knox is the founder and Chief Executive Officer of Inland Fresh. He owned 80% of Inland Fresh at the time of the Transaction and

received 80% of the proceeds of the Transaction. At all relevant times, he has been a member of the Inland Fresh Board of Directors. He resides in Atlanta, Georgia.

29. Joel Knox is and at all relevant times was a Plan fiduciary because he exercises "discretionary authority [and] discretionary control respecting management" of the Plan and exercises "authority [and] control respecting management or disposition of its assets[.]"29 U.S.C. § 1002(21)(A). Among other things, he oversaw and directed all aspects of the Transaction, including the amount of consideration paid by the Plan to acquire the Company in the Transaction.

30. Joel Knox is a party-in-interest with respect to the Plan because he is a fiduciary to the Plan. 29 U.S.C. § 1002(14) (A). Additionally, at the time of the Transaction, he was the owner of 50 percent or more of the total value of shares of all class of stock of the Company. 29 U.S.C. § 1002(14)(E)(i). Further, he is and was at all relevant times an officer or director of the Company. 29 U.S.C. § 1002(14)(H). Additionally, at the time of the Transaction, he was a 10 percent shareholder of the Company. *Id*. Moreover, he is and was at all relevant times a person providing services to the Plan. 29 U.S.C. § 1002(14)(B).

31. Bill Demmond is the Chief Operating Officer of Inland Fresh. He

owned 10% of Inland Fresh at the time of the Transaction and received 10% of the proceeds of the Transaction. At all relevant times, he has been a member of the Inland Fresh Board of Directors. He resides in Brookhaven, Georgia.

32.     Bill Demmond is and at all relevant times was a Plan fiduciary because he exercises "discretionary authority [and] discretionary control respecting management" of the Plan and exercises "authority [and] control respecting management or disposition of its assets[.]" 29 U.S.C. § 1002(21)(A). Among other things, he was a key decisionmaker directing the Transaction.

33.     Bill Demmond is a party-in-interest with respect to the Plan because he is a fiduciary to the Plan. 29 U.S.C. § 1002(14) (A). Further, he is and was at all relevant times an officer or director of the Company. 29 U.S.C. § 1002(14)(H). Additionally, at the time of the Transaction, he was a 10 percent shareholder of the Company. *Id*. Moreover, he is and was at all relevant times a person providing services to the Plan. 29 U.S.C. § 1002(14)(B).

34.     Chris Rosenberger is the President of Inland Fresh. He owned 5% of Inland Fresh at the time of the Transaction and received 5% of the proceeds of the Transaction. At all relevant times, he has been a member of

the Inland Fresh Board of Directors. He resides in Atlanta, Georgia.

35.     Chris Rosenberger is and at all relevant times was a Plan fiduciary because he exercises "discretionary authority [and] discretionary control respecting management" of the Plan and exercises "authority [and] control respecting management or disposition of its assets[.]" 29 U.S.C. § 1002(21)(A). Among other things, he was a key decisionmaker directing the Transaction.

36.     Chris Rosenberger is a party-in-interest with respect to the Plan because he is a fiduciary to the Plan. 29 U.S.C. § 1002(14) (A). Further, he is and was at all relevant times an officer or director of the Company. 29 § U.S.C. § 1002(14)(H). Moreover, he is and was at all relevant times a person providing services to the Plan. 29 U.S.C. § 1002(14)(B).

37.     Les Schneider is an attorney and Inland Fresh's registered agent. He owned 5% of Inland Fresh at the time of the Transaction and received 5% of the proceeds of the Transaction. He resides in Atlanta, Georgia.

38.     Les Schneider is and at all relevant times was a Plan fiduciary because he exercises "discretionary authority [and] discretionary control respecting management" of the Plan and exercises "authority [and] control respecting management or disposition of its assets[.]" 29 U.S.C. § 1002(21)(A). Among other things, he was a key decisionmaker directing the

Transaction.

39.     Les Schneider is a party-in-interest because he is a fiduciary to the Plan. 29 U.S.C. § 1002(14) (A). Further, he is and was at all relevant times a person providing services to the Plan. 29 U.S.C. § 1002(14)(B).

40.     James R. Urbach is trustee of the Inland Fresh Seafood Corporation of America, Inc. Employee Stock Ownership Trust ("Trust"). He resides in Atlantic Beach, Florida. He is a fiduciary per the terms of the Trust. Moreover, he exercises "discretionary authority [and] discretionary control respecting management" of the Plan and exercises "authority [and] control respecting management or disposition of its assets[.]" 29 U.S.C. § 1002(21)(A). He is a party-in-interest because he is a fiduciary to the Plan. 29 U.S.C. § 1002(14) (A). Further, he is and was at all relevant times a person providing services to the Plan. 29 U.S.C. § 1002(14)(B).

41.     Inland Fresh's ESOP Committee ("Committee") is a Plan fiduciary per the Plan and the Trust. The Plan provides that the Committee will act as the Plan administrator and will perform the day-to-day administration of the Plan. The Trust provides that the Plan will be administered by the Committee, as described in the Plan. The Committee is the named fiduciary, pursuant to 29 U.S.C. § 1102(a), and the Plan Administrator under 29 U.S.C. § 1002(16)(A)(i). In addition, the Committee

exercises "discretionary authority [and] discretionary control respecting management" of the Plan and exercises "authority [and] control respecting management or disposition of its assets[.]"29 U.S.C. § 1002(21)(A).

42.    Each Defendant is a fiduciary to the Plan under 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, or had discretionary authority or discretionary responsibility in the administration of the Plan, as described more fully herein.

43.    Because all Defendants have acted as agents of Inland Fresh, all Defendants are collectively referred to herein as "Defendants."

## APPLICABLE LEGAL STANDARDS

### I.    ERISA'S Fiduciary Standards

44.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> > (A)    for the exclusive purpose of
> >
> > > (i)    providing benefits to participants and their beneficiaries; and

        (ii)     defraying reasonable expenses of administering the plan;

[and]

        (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

45.    ERISA provides that "a person is a fiduciary with respect to a plan" among other ways, to the extent that person "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets[.]" 29 U.S.C. § 1002(21)(A).

46.    Under ERISA, fiduciaries must act prudently and for the *exclusive* benefit of participants in the plan, and not for the benefit of third parties. 29 U.S.C. § 1104(a)(1)(A).

47.    Indeed, as the Plan provides in Section 8.12, a Plan fiduciary must discharge "fiduciary duties solely in the interest of Participants and their Beneficiaries with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims."

48.    In addition to the duties of loyalty and prudence, fiduciaries are required to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent" with ERISA. 29 U.S.C. § 1104(a)(1)(D).

49.    The general fiduciary duties imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106, and are considered *per se* violations because they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent part, that:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> > (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
> > (B) lending of money or other extension of credit between the plan and a party in interest;
> > (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or]
> > (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]

50.    Similarly, Section 1106(b) provides, in pertinent part, that:

> A fiduciary with respect to a plan shall not—
>
> > (1) deal with the assets of the plan in his own interest or for his own account,
> >
> > (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or

15

the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

51.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]

(2)    if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

52.     29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## II.    Defined Contribution Plans

53.    When ERISA was enacted in 1974, defined benefit pension plans were America's retirement system. Such plans are now rarely available to employees in the private sector. "Defined contribution plans dominate the retirement plan scene today." *LaRue*, 552 U.S. at 255.

54.    Defined contribution plans allow employees to contribute a percentage of their pre-tax earnings to the plan, with the employer often matching those contributions up to a specified percentage. Each participant in a plan has an individual account. Participants direct the plan contributions into one or more investment options in a lineup chosen and assembled by the plan's fiduciaries. In a defined contribution plan, "participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*,

135 S. Ct. at 1826.

55.   Decisions by the fiduciaries of defined contribution plans have the potential to dramatically affect the amount of money that participants save for retirement. Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to ensure that they are acting exclusively in the best interests of plan participants.

## III.   Employee Stock Ownership Plans

56.   An employee stock ownership plan ("ESOP") is "an individual account plan . . . designed to invest primarily in qualifying employer securities[.]" 29 U.S.C. § 1107(6)(d)(6)(A). ESOPs differ from other employer-sponsored defined contribution plans in that they invest primarily in employer stock. ESOPs typically hold employer stock in a suspense account that transfers the stock over time to participant's accounts as an ESOP pays off its loans.

57.   While ESOPs are permitted by ERISA, they pose heightened risk to participants, because investing solely in company stock "over-concentrates the worker-participants' retirement savings in a single investment, exposing them to a dangerous level of investment risk. Employees could avoid this peril if their retirement plan assets were in a properly diversified portfolio

instead."[2]

58.     In a leveraged ESOP, the purchase of the company stock from a selling stockholder is financed. Generally, "shares of stock that the ESOP buys stand as security for the loan of the purchase money."[3] These "shares remain in a suspense account and are released and allocated to participants' accounts only in proportion to the amount of the loan's principal and interest the ESOP has repaid."[4]

59.     ESOP transactions are subject to ERISA. *Dudenhoeffer*, 573 U.S. at 420-25 (holding that ESOP fiduciaries are subject to the same fiduciary duties that apply to ERISA fiduciaries in general, except that they do not have a duty to diversify the fund's assets).

60.     Ordinarily, it would be a fiduciary breach to allow a plan to engage in a transaction with a party-in-interest if he or she knows or should know that the transaction is a direct or indirect sale or exchange of any property between the plan and the party in interest. 29 U.S.C. § 1106(A)(1)(A). It is also prohibited for a party in interest to allow a plan to

---

[2] Sean M. Anderson, *Risky Retirement Business: How ESOPs Harm the Workers They Are Supposed to Help*, 41 Loy. U. Chi. L.J. 1, 3 (2009).
[3] *Id*. at 30 (citing 29 C.F.R. § 2550.408b-3(e)).
[4] *Id.* (citing 26 C.F.R. §§ 54.4975-7, 54.4975-11 (discussing release from encumbrance and allocation to participants' accounts); 29 C.F.R. § 2550.408b-3(h) (discussing release from encumbrance)).

borrow money from a party in interest. 29 U.S.C. § 1106(a)(1)(B). It would further be prohibited for a party in interest to engage in a transaction that constitutes a direct or indirect transfer to, or use by or for the benefit of, a party in interest of any assets of a plan, generally in the form of payment for a stock or in continuing payments on a loan taken out by the ESOP to purchase the stock. 29 U.S.C. § 1106(a)(1)(D).

61.     Courts have noted that "a purchase of employer stock by the Plan and a loan by the employer to the Plan [ ] are indisputably prohibited transactions within the meaning of section 406." *Allen v. GreatBanc Trust Co.*, 835 F.3d 670, 675 (7th Cir. 2016) (citing 29 U.S.C. § 1106(a)); *see also Zavala v. Kruse-W.*, Inc., 398 F. Supp. 3d 731, 743 (E.D. Cal. 2019); *Blackwell v. Bankers Tr. Co. of S. Dakota*, No. 3:18-CV-141, 2019 WL 1433769, at *4 (S.D. Miss. Mar. 29, 2019); *Brundle v. Wilmington Tr., N.A.*, No. 1:15de-CV-1494, 2016 WL 6542718, at *12 (E.D. Va. Nov. 3, 2016); *Neil v. Zell*, 753 F. Supp. 2d 724 (N.D. Ill. 2010).

62.     ERISA, however, carves out an exception for ESOPs allowing these otherwise prohibited transactions if a plan's acquisition or sale of qualifying employer securities is made for adequate consideration. 29 USC §1108(e). This exemption, however, is an affirmative defense that must be pleaded and proven by the defendant. *Allen*, 835 F.3d at 675; *see also Gomez*

*v. Toledo*, 446 U.S. 635, 640 (1980) (holding burden to plead affirmative

defense is defendant's and plaintiff has no obligation to anticipate a defense

with statements in complaint); *Davis v. Indiana State Police*, 541 F.3d 760,

763 (7th Cir. 2008) ("Complaints need not anticipate, and attempt to plead

around, potential affirmative defenses.").

63.     The Department of Labor, through a series of settlements of

claims brought against fiduciaries of ESOPs, has established process

requirements which are generally regarded in the retirement plan industry

as minimum standards for ESOP fiduciaries to ensure compliance with

ERISA when engaging in otherwise prohibited transactions involving non-

publicly traded company stock. *E.g.*, Agreement Concerning Fiduciary

Engagements and Process Requirements for Employer Stock Transactions,

*Solis v. GreatBanc Trust Co.* (C.D. Cal. Jun. 2, 2014), ECF No. 166-1, at 13.

64.     These requirements include, but are not limited to, that in

connection with a purchase or sale of employer securities that are not

publicly traded, the relevant fiduciary should:

    a.  Hire a qualified valuation advisor;

    b.  Prudently investigate the valuation advisor's qualifications;

    c.  Take reasonable steps to determine that the valuation advisor receives complete, accurate, and current information necessary to value the employer securities;

    d.   Prudently determine that its reliance on the valuation advisor's advice is reasonable before entering into any transaction in reliance on the advice;

    e.   Not use a valuation advisor for a transaction that has previously performed work – including but not limited to a preliminary valuation – for or on behalf of the ESOP sponsor, any counterparty to the ESOP involved in the transaction, or any other entity that is structuring the transaction for any party other than the ESOP or its trustee; and

    f.   Prepare a written analysis addressing the reason for selecting the particular valuation advisor, a list of all the valuation advisors considered, a discussion of the qualifications of the valuation advisors considered, a list of references checked and discussion of the references' views on the valuation advisors, whether the valuation advisor was the subject of prior criminal or civil proceedings; and a full explanation of the bases for concluding that the selection of the valuation advisor was prudent.

*Id.*

    65.   In addition, in connection with the preparation of the valuation advisor's valuation report, the relevant fiduciary should ensure that the valuation advisor, among other things:

    a.   Documents the individuals responsible for providing any projections reflected in the valuation report, and as to those individuals, conduct reasonable inquiry as to:

        1.   Whether those individuals have or reasonably may be determined to have any conflicts of interest in regard to the ESOP; and

        2.   Whether those individuals serve as agents or employees of persons with such conflicts, and the precise nature of any such conflicts;

     b. Records in writing how the relevant fiduciary and the valuation advisor considered conflicts in determining the value of employer securities; and

     c. Document in writing an opinion as to the reasonableness of any projections considered in connection with the proposed transaction and explain in writing why and to what extent the projections arc or are not reasonable.

*Id.*

66. Moreover, the relevant fiduciary should, in connection with any transaction involving the purchase or sale of employer securities that are not publicly traded:

     a. Take reasonable steps necessary to determine the prudence of relying on the financial statements provided to the valuation advisor;

     b. Critically assess the reasonableness of any projections; and

     c. Document in writing the bases for concluding that the information supplied to the valuation advisor was current, complete, and accurate.

*Id.*

## IV. Non-Fiduciary Liability

67. A "participant, beneficiary, or fiduciary may bring suit against an 'other person' under" ERISA 502(a)(3) (29 U.S.C. § 1132(a)(3)) who "knowingly participates in a fiduciary's violation." *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 248–49 (2000).

68. A participant may bring a section 502(a)(3) claim against an

"other person" to obtain disgorgement of ill-gotten gains resulting from a breach of fiduciary duty or arising from a prohibited transaction. *In re Xerox Corp. Erisa Litig.*, 483 F. Supp. 2d at 216 (citing Harris Tr., 530 U.S. at 252).

69.    Participants may seek an accounting of unjustly obtained profits obtained by non-fiduciaries. *See Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936 (2020) (holding that a remedy seeking disgorgement of unlawful profits is an equitable remedy); Restatement (Third) of Restitution and Unjust Enrichment § 51 (2011) (court in equity may order accounting, requiring a defendant to account for its unjustly obtained profits).

### DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES AND COMMITTED PROHIBITED TRANSACTIONS

### I.    Defendants Disloyally and Imprudently Caused the Plan to Purchase Inland Fresh at a Grossly Inflated Valuation

70.    Defendants caused the Plan to purchase the Company for $92 million, a massively inflated number which dwarfed the Company's true value, based on incomplete and misleading information presented to conflicted valuation advisors without any semblance of an adequate process.

71.    The $92 million Transaction price massively exceeded any offer the Company had ever received for its acquisition, and substantially outstripped the value the Company itself disclosed shortly after the Transaction.

72.     The Company reported, in its Form 5500 submitted to the Department of Labor dated March 25, 2017, that the fair value of the company was $6.449 million, or just 7% of the purchase price.

73.     Defendants obtained the $92 million Transaction price by intentionally and actively deceiving multiple valuation advisors regarding the Company's assets and future business prospects, benefiting themselves at the expense of the Plan and its participants.

**a. Defendants' flawed and conflicted process for valuing Inland Fresh.**

74.     Defendants failed to follow the process requirements described above, which are regarded in the retirement plan industry as minimum standards for ESOP fiduciaries.

75.     Instead of obtaining an independent evaluation from a valuation advisor, Defendants solicited multiple competing valuations from various valuation advisors, essentially conducting a reverse auction to select the highest valuation.

76.     Defendants lacked any sound or reliable process for obtaining an accurate and independent valuation of the Company. Instead, Defendants obtained inaccurate business valuations based on flawed and incorrect information provided by Defendants to several different valuation advisors.

Defendants then selected the largest and most inaccurate valuation from those valuations that they received, seeking to increase the Transaction purchase price to the maximum possible amount, without regard to the interests of Plan participants or the true value of the Company.

77.     Defendants actively campaigned for larger valuations from competing valuation advisors, employing Company sales representatives to try to convince the valuation advisors to increase their business valuations based on inaccurate information.

78.     Defendants knowingly provided false information in support of the Company's valuation to valuation advisors to inflate the value of the Company in connection with the Transaction.

79.     In seeking a higher valuation for the Company, Defendants additionally claimed that the Company had in its inventory valuable products that were in fact nearly worthless.

80.     For example, around the time of the Transaction the Company possessed a large quantity of old frozen salmon filets that were essentially worthless. But in seeking a higher valuation of the Company in connection with the Transaction, Defendants falsely represented that these were fresh salmon filets worth substantial amounts.

81.     Defendants also presented false information regarding the

Company's future sales prospects.

82.    Specifically, Defendants represented that Inland Fresh had realistic prospects for future business with various customers, when in reality there was no realistic prospect of obtaining this business.

83.    For example, Defendants falsely represented that they had a realistic expectation that the retail and value-add business segments of Inland Fresh and its subsidiaries would experience increases in sales revenues of over $30 million during the approximately three-to-five-year period following the Transaction. Defendants further represented that the Company's value-add business would double in value in the three-to-five years following the Transaction. These representations had no basis, and were false.

84.    As part of Defendants' efforts to obtain an inflated Transaction price, Defendants additionally represented they expected Inland Fresh to obtain millions of dollars in business from Sam's Club over the approximately three-to-five-year period following the Transaction. In reality, however, Defendants had no realistic expectation that there would be millions of dollars in sales made by Inland Fresh to Sam's Club following the Transaction.

85.    Similarly, Defendants represented that they expected Inland

Fresh to obtain millions of dollars in new business with both Sprouts and Compass, when in reality Inland Fresh never had any realistic expectation that this business would materialize.

86.     Likewise, in order to inflate the Company's valuation, Defendants falsely represented that they had a realistic expectation that Inland Fresh would obtain millions of dollars in business abroad, in Canada and the United Kingdom. However, there was no realistic expectation that Inland Fresh would be able to successfully conduct business in these countries, even though this false information was presented by Defendants to multiple valuation advisors in order to alter their opinions regarding the Company's value.

87.     Initial business valuations prepared in connection with the Transaction suggested that the Company should be valued at approximately $50 million or less. After Defendants presented false information, these numbers increased, ultimately resulting in the $92 million Transaction price.

88.     Defendants failed to take appropriate steps to assess the reasonableness of data provided by the Company's sales representatives that was used to inflate the Company's valuation.

### b. Defendants' history of obtaining outside bids for the Company.

89.    Defendants obtained several bids to purchase the Company from competitors and other entities in the years before the Transaction, but every bid was far smaller than the Transaction's $92 million purchase price.

90.    Defendant never seriously solicited any bids from outside entities as an alternative to proceeding with the Transaction.

91.    Defendant had no process whatsoever for soliciting outside bids from potential buyers of the Company.

92.    Had Defendants not wrongfully caused the Transaction to take place at a grossly inflated valuation, Plan participants would not have lost tens of millions of dollars of their retirement savings.

## II.    Non-Fiduciary Liability of Shareholder Defendants

93.    As alleged herein, the Selling Shareholders, Defendants Joel Knox, Bill Demmond, Chris Rosenberger, and Les Schneider, were Plan fiduciaries.

94.    Additionally, even if the Selling Shareholders were not Plan fiduciaries (and they were), they are liable under 29 U.S.C. § 1132(a)(3) to disgorge their ill-gotten gains from the Transaction, as knowing participants in fiduciary breaches and in a prohibited transaction.

29

95.    The Selling Shareholders knew that the Plan's fiduciaries had failed to follow the minimum process requirements required for ESOP fiduciaries outlined herein.

96.    The Selling Shareholders knew the Plan's fiduciaries lacked any process for obtaining an accurate and independent valuation of the Company.

97.    The Selling Shareholders knew Company sales representatives were employed to try to convince valuation advisors to increase their valuations based on inaccurate information.

98.    The Selling Shareholders knew the Plan's fiduciaries knowingly provided false information in support of the Company's valuation to valuation advisors to inflate the value of the Company in connection with the Transaction.

99.    The Selling Shareholders knew that the Plan's fiduciaries never seriously solicited any bids from outside entities as an alternative to proceeding with the Transaction

100.   The Selling Shareholders knew the $92 million purchase price was a massively inflated number which dwarfed the Company's true value.

101.   Despite knowledge of these breaches and violations, the Selling Shareholders proceeded to close the Transaction.

102.   By knowingly participating in these breaches and violations, the

Selling Shareholders are subject to appropriate equitable relief including

accounting, disgorgement of any profits, imposition of a constructive trust

placed on Transaction proceeds (or funds traceable thereto), or other

appropriate equitable relief

## CLASS ACTION ALLEGATIONS

103. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of

the Plans to bring an action individually on behalf of the Plan to enforce a

breaching fiduciary's liability to the plan under 29 U.S.C. § 1109(a). 29 U.S.C.

§ 1132(a)(3) likewise authorizes any participant to obtain equitable relief on

behalf of the Plan to redress ERISA violations.

104. In acting in this representative capacity and to enhance the due

process protections of unnamed participants and beneficiaries of the Plans, as

an alternative to direct individual actions on behalf of the Plans under 29

U.S.C. § 1132(a)(2) and 29 U.S.C. § 1132(a)(3)(B), Plaintiffs seek to certify

this action as a class action on behalf of all participants and beneficiaries of

the Plans. Plaintiffs seek to certify, and to be appointed as representatives of,

the following class:

> All participants and beneficiaries of the Inland Fresh Seafood
> Corporation of America, Inc. Employee Stock Ownership Plan
> Plan from November 25, 2016 through the date of judgment,
> excluding the Defendants.

105.   This action meets the requirements of Rule 23 and is certifiable

as a class action for the following reasons:

a.   The Class includes over 500 members and is so large that joinder of all its members is impracticable.

b.   There are questions of law and fact common to this Class because the Defendants owed fiduciary duties to the Plans and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plans and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a); whether the fiduciaries of the Plans breached their fiduciary duties to the Plans; what are the losses to the Plans resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breaches of duty.

c.   Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plans were harmed by Defendants' misconduct.

d.   Plaintiffs are adequate representatives of the Class because they were participants in the Plans during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.   Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plans and personal liability to the Plans, and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plans would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the

adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

106.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

107.   Plaintiffs' counsel, Schlichter Bogard & Denton, LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

   a.   Schlichter Bogard & Denton has been appointed as class counsel in numerous other ERISA class actions regarding defined contribution plans. As Judge Charles A. Pannell, Jr. of this Court wrote, "Courts across the country have recognized the reputation, skill, and determination of Class Counsel in pursuing relief on behalf of retirement plan participants. This Court agrees." *Henderson v. Emory*

*Univ.*, Civil Action No. 16-2920-CAP, 2020 U.S. Dist. LEXIS 218676, at *9 (N.D. Ga. Nov. 4, 2020).

b.    As Chief Judge Michael J. Reagan of the Southern District of Illinois recognized in approving a settlement which was reached on the eve of trial after eight years of litigation, resulting in a $62 million monetary recovery and very substantial affirmative relief to benefit the Plans, the firm had shown "exceptional commitment and perseverance in representing employees and retirees seeking to improve their retirement plans[.]" *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S. Dist. LEXIS 93206, at *4–5 (S.D. Ill. July 17, 2015). In that same case, Judge Reagan recognized that the law firm of "Schlichter, Bogard & Denton has had a humungous impact over the entire 401(k) industry, which has benefited employees and retirees throughout the entire country by bringing sweeping changes to fiduciary practices." *Abbott*, 2015 U.S. Dist. LEXIS 93206, at *9 (internal quotations omitted).

c.    Other courts have made similar findings: "It is clear to the Court that the firm of Schlichter Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S. Dist. LEXIS 166816 at 8 (N.D. Ill. June 26, 2012).

d.    U.S. District Court Judge Harold A. Baker acknowledged the significant impact of the firm's work by stating that as of 2013 the nationwide "fee reduction attributed to Schlichter Bogard & Denton's fee litigation and the Department of Labor's fee disclosure regulations approach *$2.8 billion in annual savings* for American workers and retirees." *Nolte v. Cigna Corp.*, No. 2:07-cv-2046-HAB-DGB, 2013 U.S. Dist. LEXIS 184622, at *6 (C.D. Ill. Oct. 15, 2013).

d.    After a full trial of an ERISA case, resulting in a $36.9 million judgment for the plaintiffs that was affirmed in part by the Eighth Circuit, *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014), the district court, in awarding attorney's fees, concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). Following remand, the district court again awarded Plaintiffs' attorneys' fees, emphasizing the significant contribution Plaintiffs'

attorneys have made to ERISA litigation: "Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards." *Tussey v. ABB, Inc.,* No. 06-4305, 2015 U.S. Dist. LEXIS 164818 at 7–8 (W.D. Mo. Dec. 9, 2015).

    e.    On November 3, 2016, Judge Michael Ponsor of the United States District Court for the District of Massachusetts found that by securing a $30.9 million settlement, Schlichter Bogard & Denton had achieved an "outstanding result for the class," and "demonstrated extraordinary resourcefulness, skill, efficiency and determination." *Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Doc. 144 at 5 (D. Mass. November 3, 2016).

    f.    Schlichter Bogard & Denton also handled *Tibble v. Edison International*, in which the Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" 135 S. Ct. at 1829. The firm likewise handled *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022), again obtaining a unanimous decision from the Supreme Court in an ERISA case on behalf of retirement plan participants.

    g.    The firm's work in ERISA class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016);[5] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014);[6] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015);[7] Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. TIMES (Oct. 16, 2014);[8] Sara Randazzo, *Plaintiffs'*

---

[5] Available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

[6] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[7] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[8] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

*Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015);[9] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); [10] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[11] Mark Miller*, Are 401(k) Fees Too High? The High-Court May Have an Opinion*, REUTERS (May 1, 2014);[12] Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct. 2, 2014).[13]

## COUNT I

## Breach of Fiduciary Duties—29 U.S.C. § 1104(a)(1)(A) & (B) (Against All Defendants)

108.   Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

109.   Defendants were required to discharge their duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, prudence, and diligence required by ERISA.

---

[9] Available at http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

[10] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[11] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[12] Available at http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

[13] Available at http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

110.   Defendants breached their duties under 29 U.S.C. § 1104(a)(1).

These breaches include but are not limited to the following:

    a.  Defendants failed to take reasonable steps to determine that they received complete, accurate, and current information necessary to value the Company's stock;

    b.  Defendants failed to conduct a reasonable inquiry concerning whether the individuals responsible for providing the Company's financial projections (a) had conflicts of interest in regards to the Plan, and/or (b) served as agents or employees of persons with such conflicts;

    c.  Defendants did not adequately investigate or evaluate the reasonableness of the financial projections considered in connection with the Transaction;

    d.  Defendants did not take reasonable steps necessary to determine the prudence of relying on the Company's financial statements;

    e.  Defendants caused the Plan to pay more than fair market value for Company stock;

    f.  Defendants failed to conduct a thorough and independent review and adequately consider whether the Transaction was in the best interests of Plan participants;

    g.  Defendants caused the caused the Plan to take on excessive debt in connection with the Transaction;

    h.  Defendants failed to undertake an adequate and independent valuation of Company stock prior to the Transaction;

    i.  Defendants failed to adequately consider all material facts in negotiating the ESOP Transaction; and

    j.  Defendants failed to adequately remedy the ESOP's overpayment for Company stock at any time between November 2016 and the present.

111.   Each Defendant knowingly participated in the breaches of the other Defendants, knowing that such acts were breaches, enabled the other Defendants to commit breaches by failing to lawfully discharge fiduciary duties, knew of the breaches by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breaches. Thus, each Defendant is liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT II

## Prohibited Transactions—29 U.S.C. § 1106(a)-(b)

112.   Plaintiffs restate and incorporate herein the allegations of the preceding paragraphs.

113.   Section 1106(a)(1) prohibits transactions between a plan and a "party in interest," and provides as follows:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> (A)   sale or exchange, or leasing, of any property between the plan and a party in interest;
> * * *
> (C)   furnishing of goods, services, or facilities between the plan and  party in interest;
> (D)   transfer to, or use by or for the benefit of a party in interest, of any assets of the plan …

29 U.S.C. § 1106(a)(1).

114.   Congress defined "party in interest" to encompass "those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries," such as employers, other fiduciaries, and service providers. *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 242 (2000); 29 U.S.C. § 1002(14)(A)–(C).

115.   As alleged herein, Defendants are parties in interest. 29 U.S.C. § 1002(14)(B).

116.   The Transaction was between the Plan and parties in interest, namely the Selling Shareholders.

117.   As alleged herein, the Transaction was caused by Defendants in their capacities as fiduciaries to the Plan.

118.   Defendants engaged in a prohibited transaction in violation of 29 U.S.C. § 1106(a) in the Transaction.

119.   Defendants failed to ensure that the Plan paid no more than fair market value for Company stock purchased by the Plan.

120.   29 U.S.C. § 1106(b), forbids plan fiduciaries from "act[ing] in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants," or "deal[ing] with the assets of the plan in [their] own interest or for [their] own account," or "receiv[ing] any consideration for [their] own

personal account[s] from any party dealing with such plan in connection with a transaction involving the assets of the plan."

121.   The Company and the Selling Shareholders dealt with the assets of the Plan in their own interest and for their own account, and received consideration for their own personal accounts from the Plan in connection with the Transaction, by causing the Plan to acquire Company stock at grossly inflated values. This benefited the Company and the Selling Shareholders to the detriment of the Plan.

122.   Defendant Urbach and the ESOP Committee acted on behalf of the Selling Shareholders and/or the Company in connection with the Transaction by causing the Plan to acquire Company stock at grossly inflated values. This benefited the Company and the Selling Shareholders to the detriment of the Plan, even though Defendant Urbach and the ESOP Committee were required to serve prudently and solely in the interest of the Plan in connection with any such transaction.

123.   Under 29 U.S.C. § 1109(a), Defendants are liable to restore all losses to the Plans resulting from these prohibited transactions, and to provide restitution of all proceeds of these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

124.   Each Defendant knowingly participated in these transactions,

enabled the other Defendants to cause the Plans to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy or discontinue the transactions. Thus, under 29 U.S.C. § 1105(a), each Defendant is liable for restoring all the proceeds and losses attributable to these transactions.

## COUNT III

### Failure to Monitor Fiduciaries
### (Against Defendants Inland Fresh Seafood Corporation of America, Inc., Joel Knox, Bill Demmond, Chris Rosenberger, and the Inland Fresh Seafood Corporation of America, Inc. ESOP Committee)

125. Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

126. This Count alleges breach of fiduciary duties against Defendants Inland Fresh Seafood Corporation of America, Inc., Joel Knox, Bill Demmond, Chris Rosenberger, and the Inland Fresh Seafood Corporation of America, Inc. ESOP Committee.

127. Inland Fresh acts through its Board of Directors, which is authorized to designate a person or a committee to act on behalf of the Plan.

128. Inland Fresh, through its Board of Directors, has created and controls the membership of the ESOP Committee.

129. At all relevant times, Joel Knox, Bill Demmond, and Chris

Rosenberger were members of the Inland Fresh Board of Directors.

130.   The ESOP Committee is the named fiduciary of the Plan with the overall responsibility for the control, management and administration of the Plan, in accordance with 29 U.S.C. § 1102(a). The ESOP Committee is also the Plan Administrator of the Plan under 29 U.S.C. § 1002(16)(A)(i) with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable it to properly carry out such responsibilities, including to monitor the Trustee, James R. Urbach.

131.   Given that Inland Fresh has overall responsibility for the oversight of its plan, these Defendants had a fiduciary responsibility to monitor the performance of the other fiduciaries, including those individuals who were delegated fiduciary responsibility to administer and manage Plan assets.

132.   A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

133.   To the extent any of Inland Fresh's fiduciary responsibilities were delegated to another fiduciary, its monitoring duty included an obligation to

ensure that any delegated tasks were being performed prudently and loyally.

134.   Inland Fresh, Joel Knox, Bill Demmond, Chris Rosenberger, and the Inland Fresh Seafood Corporation of America, Inc. ESOP Committee breached their fiduciary monitoring duties by, among other things:

    a.  Failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and omissions with respect to the Plan;

    b.  Failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach;

    c.  Failing to ensure that the monitored fiduciaries had prudent processes in place; and

    d.  Failing to remove appointees whose performance was inadequate.

135.   Had Defendants Inland Fresh, Joel Knox, Bill Demmond, Chris Rosenberger, and the Inland Fresh Seafood Corporation of America, Inc. ESOP Committee discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, and the Plaintiffs and the other Class members, lost tens of millions of dollars of their retirement savings.

136.   Inland Fresh is liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties

alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## COUNT IV

### Non-fiduciary Liability for Fiduciary Breach – 29 U.S.C. § 1132(a)(3)(B)
### (Against the Selling Shareholders)

137. Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

138. As alleged herein, the Selling Shareholders are Plan fiduciaries. Additionally, regardless of whether the Selling Shareholders were Plan fiduciaries at the relevant time, they are liable to disgorge their ill-gotten gains from the Transaction, because they were knowing participants in the fiduciary breaches alleged herein. ERISA 502(a)(3) (29 U.S.C. § 1132(a)(3)); *Harris Tr.,* 530 U.S. at 248–49 (2000); *In re Xerox Corp. Erisa Litig.*, 483 F. Supp. 2d at 216.

## COUNT V

### Non-fiduciary Liability for Prohibited Transactions – 29 U.S.C. § 1132(a)(3)(B)
### (Against the Selling Shareholders)

139. Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

140. As alleged herein, the Selling Shareholders are Plan fiduciaries.

Additionally, regardless of whether the Selling Shareholders were Plan fiduciaries at the relevant time, they are liable to disgorge their ill-gotten gains from the Transaction, because they were knowing participants in the prohibited transactions alleged herein. ERISA 502(a)(3) (29 U.S.C. 1132(a)(3)); *Harris Tr.,* 530 U.S. at 248–49 (2000); *In re Xerox Corp. Erisa Litig.*, 483 F. Supp. 2d at 216.

## JURY TRIAL DEMANDED

Under Federal Rule of Civil Procedure 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plans and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- Find and declare that Defendants have breached their fiduciary duties as described above;

- Find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position they would have occupied but for the breaches of fiduciary duty;

- Determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated;

- Order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plans under 29 U.S.C. § 1109(a);

- Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- Order an accounting of all wrongfully obtained funds and profits generated from the Transaction;

- Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- Order disgorgement of all wrongful profits generated from the Transaction;

- Reform the Plan;

- Certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter Bogard & Denton, LLP as Class Counsel;

- Award to the Plaintiffs and the Class their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant other equitable or remedial relief as the Court deems appropriate.

November 18, 2022                  Respectfully submitted,

                                   /s/ Bradley S. Wolff
                                   Bradley S. Wolff, GA No. 773388
                                   SWIFT, CURRIE, MCGHEE, & HIERS, LLP
                                   1420 Peachtree St., NE, Suite 800
                                   Atlanta, GA 30309
                                   Phone: (404) 874-8800
                                   Fax: (404) 888-6199
                                   brad.wolff@swiftcurrie.com

                                   *Local Counsel for Plaintiffs*

SCHLICHTER BOGARD & DENTON, LLP
Andrew D. Schlichter*
Heather Lea*
Alexander L. Braitberg*
100 South Fourth Street, Ste. 1200
St. Louis, MO 63102
Phone: (314) 621-6115
Fax: (314) 621-5934
aschlichter@uselaws.com
hlea@uselaws.com
abraitberg@uselaws.com
* *pro hac vice* forthcoming

*Lead Counsel for Plaintiffs*

47