# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| RANI BOLTON, ALISON MERCKER, JAMES ARMSTRONG, MELISSA SUTER, and BENJAMIN LYMAN, individually and as representatives of a class of participants and beneficiaries on behalf of the INLAND FRESH SEAFOOD CORPORATION OF AMERICA, INC. EMPLOYEE STOCK OWNERSHIP PLAN, | No. 1:22-cv-4602-LMM |
| *Plaintiffs*, | |
| v. | CLASS ACTION |
| INLAND FRESH SEAFOOD CORPORATION OF AMERICA, INC., JOEL KNOX, BILL DEMMOND, CHRIS ROSENBERGER, LES SCHNEIDER, JAMES R. URBACH, and the INLAND FRESH SEAFOOD CORPORATION OF AMERICA, INC. ESOP COMMITTEE, | JURY TRIAL DEMANDED |
| *Defendants*. | |

## AMENDED COMPLAINT

1.    Plaintiffs Rani Bolton, Alison Mercker, James Armstrong, Melissa Suter, and Benjamin Lyman, individually and as representatives of a class of  participants and beneficiaries in the Inland Fresh Seafood

Corporation of America, Inc. Employee Stock Ownership Plan (the "Plan"), bring this action under 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1132(a)(3)(B) on behalf of the Plan against Defendants Inland Fresh Seafood Corporation of America, Inc. ("Inland Fresh" or the "Company"), Joel Knox, Bill Demmond, Chris Rosenberger, Les Schneider, James R. Urbach, and the Inland Fresh Seafood Corporation of America, Inc. ESOP Committee (collectively, "Defendants") for breaches of fiduciary duties under ERISA.[1]

2.      As Plan fiduciaries, Defendants are obligated to act prudently and for the exclusive benefit of Plan participants and beneficiaries. These duties "are the highest known to the law." *Fuller v. Suntrust Banks, Inc.,* 744 F.3d 685, 695 (11th Cir. 2014); 29 U.S.C. § 1104(a). Instead of discharging their duties in the exclusive best interests of participants, Defendants caused Inland Fresh shares to be sold to the Plan (the "Transaction") for a price far in excess of their fair market value, in an act of blatant self-dealing.

3.      As described herein, the Transaction allowed the selling shareholders, i.e., Defendants Joel Knox, Bill Demmond, Chris Rosenberger, and Les Schneider (the "Selling Shareholders"), to enrich themselves at the expense of the Plan. When the Selling Shareholders decided to sell the

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461.

Company, they did not seek bids from sophisticated buyers on the open market who would negotiate at arm's length after performing appropriate due diligence to accurately gauge the Company's value. Instead, the Selling Shareholders decided to unload their interests by creating an ESOP—the Plan. This allowed the Selling Shareholders, in their capacities as members of the Company's Board of Directors, to hand-select their counter-party in the transaction: Defendant Urbach, the Plan's Trustee. And Urbach played along with the Selling Shareholders' scheme by approving their grossly inflated $92 million sale price on behalf of the Plan without appropriate due diligence, thereby sacrificing the interests of Plan participants to enrich the Selling Shareholders. In so doing, Urbach also preserved his own financial interest in continuing to serve as the Plan's Trustee, a role which would have been imperiled had he thwarted the Selling Shareholders' exit plan by fulfilling his duty to ensure that the Plan and its participants paid no more than reasonable, fair market value in the Transaction. The ESOP Committee, meanwhile, stood idly by, abdicating their fiduciary responsibility to prevent and cure their co-fiduciaries' ERISA violations and to protect the interests of Plan participants.

4.      To remedy the misconduct described above, Plaintiffs, individually and as representatives of a class of participants and beneficiaries

of the Plan, bring this action on behalf of the Plan under 29 U.S.C.

§ 1132(a)(2) for appropriate relief under § 1109(a) and alternatively under 29

U.S.C. § 1132(a)(3)(B). All of the Defendants are jointly and severally liable

for the losses to the Plan and its participants caused by the ERISA violations

described above, measured by the excess paid by the Plan compared to the

Company's fair market value at the time of the Transaction, a sum which

Plaintiffs estimate to be in the tens of millions of dollars. The Selling

Shareholders are also subject to various equitable remedies—restitution or

disgorgement of ill-gotten gains and rescission of the unlawful Transaction—

even if they were not acting as ERISA fiduciaries (which they were), because

they knowingly participated in fiduciary breaches and self-dealing

transactions prohibited by ERISA. In addition, Plaintiffs seek such other

equitable or remedial relief for the Plan as the Court may deem appropriate.

5.    Because this is a "case of fraud or concealment," as discussed in

detail below, *see infra* ¶¶ 138–42, ERISA's statute of limitations was tolled

until Plaintiffs discovered Defendants' misconduct shortly before filing suit.

*See* 29 U.S.C. § 1113.

## JURISDICTION AND VENUE

6.    **Subject-matter jurisdiction.** This Court has exclusive

jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1)

and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1132(a)(3)(B).

7.    **Venue.** This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the District in which the subject Plan is administered, where at least one of the alleged breaches took place, and where the Defendants reside or may be found.

8.    **Standing.** Congress authorized any plan participant to file a civil action in a representative capacity on an employee benefit plan to seek relief on behalf of the plan, which is the same authority granted to the Secretary of Labor. 29 U.S.C. § 1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses caused by Defendants' ERISA violations and remains exposed to harm and continued future losses, injuries which may be redressed by a judgment of this Court in favor of Plaintiffs. "[T]he 'loss[]' to the plan' is the amount that the ESOP overpaid for [Inland] stock." *Perez v. Bruister*, 823 F.3d 250, 258 (5th Cir. 2016). Although section 1132(a)(2) does not provide redress for individual injuries as distinct from plan injuries, *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008), each of the named Plaintiffs sustained injury-in-fact in the form of a financial loss to their individual plan accounts. "[T]he losses suffered by the participants in the ESOP are coterminous with those of the plan." *Bruister*,

5

823 F.3d at 258. Each Plaintiffs' individual loss is proportional to that of the Plan as whole and the losses of the other Plan participants. *Id*. Moreover, because the purchase price was grossly inflated, Plaintiffs are exposed to the risk that "the debt load" incurred for the Transaction will be "unsustainable," causing Plan participants' shares to become worthless. *See Chesemore v. Fenkell*, 829 F.3d 803, 807 (7th Cir. 2016). Even in the absence of default, the inflated sales price and corresponding debt require the Company to devote more capital to paying off the financing required to obtain the shares. That reduces the amount of cash that would otherwise remain in the Company, thus reducing the value of the Company (and participant's shares) and requiring the Company to forego other uses of those funds that could be used to add value for shareholders. The inflated loan value also takes longer to pay off, thereby reducing the number of shares released to participants each year and reducing the value of each participant's account.

**PARTIES**

## I.    **The Plan**

9.    The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(34).

10.    The Plan is established and maintained under a written document pursuant to 29 U.S.C. § 1102(a)(1).

11.    The Plan was established on March 27, 2016.

12.    The Plan operates as a leveraged employee stock ownership plan.

13.    The Plan provides for retirement income for employees of Inland Fresh. The Plan is a "defined contribution" or "individual account" plan. 29 U.S.C. § 1002(34). Each Plan participant has an individual account. Each participant's benefit at retirement is limited to the value of the individual account, which depends upon contributions made on behalf of each employee by his or her employer, and from the performance of investments net of fees and expenses.

14.    Employees who work at Inland Fresh as well as its participating subsidiaries are generally eligible to participate in the Plan after they have completed 1,000 hours of service within a 12-month period and are at least 21 years old. Employees are not allowed to make contributions to their accounts.

15.    Employees are "vested," i.e., entitled to receive benefits, based on their service time. Employees are 20% vested after 2 years of service, 40% vested after 3 years, 60% vested after 4 years of service, 80% vested after 5 years of service, and 100% vested after 6 years of service. Participants who worked at Inland Fresh for five years prior to the Transaction received additional vesting based on their years of prior service.

16.    On November 26, 2016, the Plan purchased 100,000 shares of

Inland Fresh common stock using the proceeds of a loan guaranteed by the Company (i.e., the Transaction). The Plan holds the common stock in a trust established under the Plan. The borrowing is to be repaid over a period of thirty years via contributions to a trust fund.

17.    In 2016, the Plan entered into a $92,000,000 term loan agreement with Inland Fresh. The proceeds of the loan were used to purchase Inland Fresh common stock. Unallocated shares are collateral for the loan. Shares are released from collateral and allocated to participants when principal and interest payments are made. The number of shares released in any year is the number of shares held as collateral, multiplied by the ratio of the current year payments, divided by the total of the year's payments, plus all future years' principal and interest payment.

18.    Defendants controlled and directed the terms of the Transaction.

19.    As of March 27, 2020, the Plan had 578 participants with account balances.  According to the Plan's Form 5500 filed with the U.S. Department of Labor, its assets were at a net deficit, including both allocated and unallocated shares, of $49,580,581.

## II.    Plaintiffs

20.    Rani Bolton is a former Project Manager at Inland Fresh, and resides in Dunwoody, Georgia. She is a participant in the Plan under 29

U.S.C. § 1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

21.    Alison Mercker is a former Regional Sales Executive at Inland Fresh and resides in Tucker, Georgia. She is a participant in the Plan under 29 U.S.C. § 1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

22.    James Armstrong is a former Sales Executive at Inland Fresh and resides in Guntersville, Alabama. He is a participant in the Plan under 29 U.S.C. § 1002(7) because he and his beneficiaries are eligible to receive benefits under the Plan.

23.    Melissa Suter is a former Sales Representative at Inland Fresh and resides in Avondale Estates, Georgia. She is a participant in the Plan under 29 U.S.C. § 1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

24.    Benjamin Lyman is a former Operations Manager at Inland Fresh and resides in Tucker, Georgia. Although his account balance was distributed in 2021, he remains a "participant" as defined in 29 U.S.C. § 1002(7) because he "may become eligible to receive" additional benefits under the Plan if this action is successful.

## III.  Defendants

25.    Inland Fresh is a domestic corporation organized under Georgia law with its principal place of business in Tucker, Georgia. Inland Fresh is the plan sponsor, and is responsible for the administration and management of the Plan.

26.    Inland Fresh acts through its Board of Directors, which has appointed the ESOP Committee to act as its agent in performing Plan administration and management. Based on the conduct of its agents as described herein, Inland Fresh is a fiduciary because it exercises "discretionary authority [and] discretionary control respecting management" of the Plan and exercises "authority [and] control respecting management or disposition of its assets[.]" 29 U.S.C. § 1002(21)(A). The ESOP Committee is the Plan "administrator" under 29 U.S.C. § 1002(16)(A)(i) and "named fiduciary" under 29 U.S.C. § 1102(a) with responsibility and authority to control and manage the operation and administration of the Plan.

27.    Joel Knox is the founder and Chief Executive Officer of Inland Fresh. He owned 80% of Inland Fresh at the time of the Transaction and received 80% of the proceeds of the Transaction. At all relevant times, he has been a member of the Inland Fresh Board of Directors. He resides in Atlanta, Georgia.

28.    Based on the facts alleged herein, Joel Knox is and at all relevant times was a Plan fiduciary because he exercises "discretionary authority [and] discretionary control respecting management" of the Plan and exercises "authority [and] control respecting management or disposition of its assets[.]"29 U.S.C. § 1002(21)(A). Among other things, he oversaw and directed all aspects of the Transaction, including the amount of consideration paid by the Plan to acquire the Company in the Transaction.

29.    Joel Knox is a party-in-interest with respect to the Plan because he is a fiduciary to the Plan. 29 U.S.C. § 1002(14)(A). Additionally, at the time of the Transaction, he was the owner of 50 percent or more of the total value of shares of all class of stock of the Company. 29 U.S.C. § 1002(14)(E)(i). Further, he is and was at all relevant times an officer or director of the Company. 29 U.S.C. § 1002(14)(H). Additionally, at the time of the Transaction, he was a 10 percent shareholder of the Company. *Id*. Moreover, he is and was at all relevant times a person providing services to the Plan. 29 U.S.C. § 1002(14)(B).

30.    Bill Demmond is the Chief Operating Officer of Inland Fresh. He owned 10% of Inland Fresh at the time of the Transaction and received 10% of the proceeds of the Transaction. At all relevant times, he has been a member of the Inland Fresh Board of Directors. He resides in Brookhaven,

Georgia.

31.    Based on the facts alleged herein, Bill Demmond is and at all relevant times was a Plan fiduciary because he exercises "discretionary authority [and] discretionary control respecting management" of the Plan and exercises "authority [and] control respecting management or disposition of its assets[.]" 29 U.S.C. § 1002(21)(A). Among other things, he was a key decisionmaker directing the Transaction.

32.    Bill Demmond is a party-in-interest with respect to the Plan because he is a fiduciary to the Plan. 29 U.S.C. § 1002(14)(A). Further, he is and was at all relevant times an officer or director of the Company. 29 U.S.C. § 1002(14)(H). Additionally, at the time of the Transaction, he was a 10 percent shareholder of the Company. *Id*. Moreover, he is and was at all relevant times a person providing services to the Plan. 29 U.S.C. § 1002(14)(B).

33.    Chris Rosenberger is the President of Inland Fresh. He owned 5% of Inland Fresh at the time of the Transaction and received 5% of the proceeds of the Transaction. At all relevant times, he has been a member of the Inland Fresh Board of Directors. He resides in Atlanta, Georgia.

34.    Based on the facts alleged herein, Chris Rosenberger is and at all relevant times was a Plan fiduciary because he exercises "discretionary

authority [and] discretionary control respecting management" of the Plan and exercises "authority [and] control respecting management or disposition of its assets[.]" 29 U.S.C. § 1002(21)(A). Among other things, he was a key decisionmaker directing the Transaction.

35.    Chris Rosenberger is a party-in-interest with respect to the Plan because he is a fiduciary to the Plan. 29 U.S.C. § 1002(14)(A). Further, he is and was at all relevant times an officer or director of the Company. 29 § U.S.C. § 1002(14)(H). Moreover, he is and was at all relevant times a person providing services to the Plan. 29 U.S.C. § 1002(14)(B).

36.    Les Schneider is an attorney and Inland Fresh's registered agent. He owned 5% of Inland Fresh at the time of the Transaction and received 5% of the proceeds of the Transaction. He is or has been a member of the Inland Fresh Board of Directors.[2] He resides in Atlanta, Georgia.

37.    Based on the facts alleged herein, Les Schneider is and at all relevant times was a Plan fiduciary because he exercises "discretionary authority [and] discretionary control respecting management" of the Plan and exercises "authority [and] control respecting management or disposition of its

---

[2] https://perma.cc/DX2G-RNBM
(https://thebrunswicknews.com/news/local_news/oyster-bill-approved-following-heated-words/article_b0555943-b870-5574-bd76-3207e9a4b169.html).

assets[.]" 29 U.S.C. § 1002(21)(A). Among other things, he was a key decisionmaker directing the Transaction.

38.    Les Schneider is a party-in-interest because he is a fiduciary to the Plan. 29 U.S.C. § 1002(14)(A). Further, he is or was an officer or director of the Company. 29 U.S.C. § 1002(14)(H). And he is and was at all relevant times a person providing services to the Plan. 29 U.S.C. § 1002(14)(B).

39.    James R. Urbach is trustee of the Inland Fresh Seafood Corporation of America, Inc. Employee Stock Ownership Trust ("Trust"). He resides in Atlantic Beach, Florida. He is a fiduciary per the terms of the Trust. Moreover, based on the facts alleged herein, he exercises "discretionary authority [and] discretionary control respecting management" of the Plan and exercises "authority [and] control respecting management or disposition of its assets[.]" 29 U.S.C. § 1002(21)(A). He is a party-in-interest because he is a fiduciary to the Plan. 29 U.S.C. § 1002(14)(A). Further, he is and was at all relevant times a person providing services to the Plan. 29 U.S.C. § 1002(14)(B).

40.    Inland Fresh's ESOP Committee ("Committee") is a Plan fiduciary per the Plan and the Trust. The Plan provides that the Committee will act as the Plan administrator and will perform the day-to-day administration of the Plan. The Trust provides that the Plan will be

administered by the Committee, as described in the Plan. The Committee is the named fiduciary, pursuant to 29 U.S.C. § 1102(a), and the Plan Administrator under 29 U.S.C. § 1002(16)(A)(i). In addition, based on the facts alleged herein, the Committee exercises "discretionary authority [and] discretionary control respecting management" of the Plan and exercises "authority [and] control respecting management or disposition of its assets[.]" 29 U.S.C. § 1002(21)(A).

41.    Each Defendant is a fiduciary to the Plan under 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, or had discretionary authority or discretionary responsibility in the administration of the Plan, as described more fully herein.

42.    All Defendants have acted as agents of Inland Fresh.

## BACKGROUND FACTS AND LEGAL STANDARDS

### I.    ERISA's Fiduciary Standards

43.    A plan document must identify one or more "named fiduciaries." 29 U.S.C. § 1102(a). In addition, a person can become "a fiduciary with respect to a plan" by performing certain functions, including to the extent that person "exercises any discretionary authority or discretionary control

respecting management of such plan or exercises any authority or control

respecting management or disposition of its assets[.]" 29 U.S.C. §

1002(21)(A).

44.    ERISA imposes strict duties of loyalty and prudence upon

fiduciaries:

> [A] fiduciary shall discharge his duties with respect to a plan solely
> in the interest of the participants and beneficiaries and –
>
> (A)    for the exclusive purpose of
>
> > (i)    providing benefits to participants and their
> > beneficiaries; and
> > (ii)    defraying reasonable expenses of administering
> > the plan;
>
> [and]
>
> (B)    with the care, skill, prudence, and diligence under the
> circumstances then prevailing that a prudent man
> acting in a like capacity and familiar with such
> matters would use in the conduct of an enterprise of
> like character and with like aims.

45.    Thus, Plan fiduciaries were obligated to act prudently and for the

*exclusive* benefit of Plan participants, and not for the benefit of third parties.

29 U.S.C. § 1104(a)(1)(A). Indeed, the Plan expressly incorporated these

ERISA standards in Section 8.12, stating that a Plan fiduciary must

discharge "fiduciary duties solely in the interest of Participants and their

Beneficiaries with the care, skill, prudence and diligence under the

circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims."

46.    In addition to the duties of loyalty and prudence, fiduciaries are required to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent" with ERISA. 29 U.S.C. § 1104(a)(1)(D).

47.    The general fiduciary duties imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106 and are considered *per se* violations because they entail a high potential for abuse.

48.    Section 1106(a)(1) prohibits transactions between the plan and a party in interest, defined to include insiders who a fiduciary may be inclined to favor at the plan's expense:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> > (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
> > (B) lending of money or other extension of credit between the plan and a party in interest;
> > (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or]

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]

49.     Section 1106(b) prohibits a fiduciary from engaging in certain transactions with the plan, which often involve self-dealing:

A fiduciary with respect to a plan shall not—

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

50.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]

18

(2)    if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

51.    29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## II.    Defined Contribution Plans

52.    When ERISA was enacted in 1974, defined benefit pension plans were America's retirement system. Such plans are now rarely available to employees in the private sector. "Defined contribution plans dominate the retirement plan scene today." *LaRue*, 552 U.S. at 255.

53.    In a defined-contribution plan, each participant has an individual account that is funded by contributions from the employee, employer, or both.

"[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 575 U.S. at 525.

54.    Decisions by the fiduciaries of defined contribution plans have the potential to dramatically affect the participants' retirement assets. Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to ensure that they act prudently and exclusively in the best interests of plan participants.

## III.   Employee Stock Ownership Plans

55.    An employee stock ownership plan ("ESOP") is "an individual account plan . . . designed to invest primarily in qualifying employer securities[.]" 29 U.S.C. § 1107(6)(d)(6)(A). ESOPs differ from other employer-sponsored defined contribution plans (*e.g.*, 401(k) plans) which allow participants to allocate their account balances to one or more diversified investment options. ESOPs invest primarily in undiversified employer stock. ESOPs typically hold employer stock in a suspense account that transfers the stock over time to participants' accounts as an ESOP pays off its loans.

56.    While ESOPs are permitted by ERISA, they pose heightened risk to participants, because investing solely in company stock "over-concentrates

the worker-participants' retirement savings in a single investment, exposing them to a dangerous level of investment risk. Employees could avoid this peril if their retirement plan assets were in a properly diversified portfolio instead."[3]

57.    In a leveraged ESOP, the purchase of the company stock from a selling stockholder is financed. Generally, "shares of stock that the ESOP buys stand as security for the loan of the purchase money."[4] These "shares remain in a suspense account and are released and allocated to participants' accounts only in proportion to the amount of the loan's principal and interest the ESOP has repaid."[5]

58.    ESOP transactions are subject to ERISA. *Dudenhoeffer*, 573 U.S. at 420–25 (holding that ESOP fiduciaries are subject to the same fiduciary duties that apply to ERISA fiduciaries in general, except that they do not have a duty to diversify the fund's assets).

59.    Ordinarily, it would be a fiduciary breach to allow a plan to engage in a transaction with a party-in-interest if he or she knows or should

---

[3] Sean M. Anderson, *Risky Retirement Business: How ESOPs Harm the Workers They Are Supposed to Help*, 41 Loy. U. Chi. L.J. 1, 3 (2009).

[4] *Id*. at 30 (citing 29 C.F.R. § 2550.408b-3(e)).

[5] *Id*. (citing 26 C.F.R. §§ 54.4975-7, 54.4975-11 (discussing release from encumbrance and allocation to participants' accounts); 29 C.F.R. § 2550.408b-3(h) (discussing release from encumbrance)).

know that the transaction is a direct or indirect sale or exchange of any property between the plan and the party in interest. 29 U.S.C. § 1106(A)(1)(A). It is also prohibited for a plan to borrow money from a party in interest. 29 U.S.C. § 1106(a)(1)(B). It would further be prohibited for a party in interest to engage in a transaction that constitutes a direct or indirect transfer to, or use by or for the benefit of, a party in interest of any assets of a plan, generally in the form of payment for a stock or in continuing payments on a loan taken out by the ESOP to purchase the stock. 29 U.S.C. § 1106(a)(1)(D).

60.    Courts have held that "a purchase of employer stock by the Plan and a loan by the employer to the Plan [ ] are indisputably prohibited transactions within the meaning of section 406." *Allen v. GreatBanc Trust Co.*, 835 F.3d 670, 675 (7th Cir. 2016) (citing 29 U.S.C. § 1106(a)); *see also Zavala v. Kruse-W.*, Inc., 398 F. Supp. 3d 731, 743 (E.D. Cal. 2019); *Blackwell v. Bankers Tr. Co. of S. Dakota*, No. 3:18-CV-141, 2019 WL 1433769, at *4 (S.D. Miss. Mar. 29, 2019); *Brundle v. Wilmington Tr., N.A.*, No. 1:15de-CV-1494, 2016 WL 6542718, at *12 (E.D. Va. Nov. 3, 2016); *Neil v. Zell*, 753 F. Supp. 2d 724 (N.D. Ill. 2010).

61.    ERISA, however, carves out an exception for ESOPs allowing these otherwise prohibited transactions if a plan's acquisition or sale of

qualifying employer securities is made for adequate consideration. 29 USC

§1108(e). This exemption, however, is an affirmative defense that must be

pleaded and proven by the defendant. *Allen*, 835 F.3d at 675; *see also Gomez*

*v. Toledo*, 446 U.S. 635, 640 (1980) (holding burden to plead affirmative

defense is defendant's and plaintiff has no obligation to anticipate a defense

with statements in complaint); *Davis v. Indiana State Police*, 541 F.3d 760,

763 (7th Cir. 2008) ("Complaints need not anticipate, and attempt to plead

around, potential affirmative defenses.").

62.    The Department of Labor, through a series of settlements of

claims brought against fiduciaries of ESOPs, has established process

requirements which are generally regarded in the retirement plan industry

as minimum standards for ESOP fiduciaries to ensure compliance with

ERISA when engaging in otherwise prohibited transactions involving non-

publicly traded company stock. *E.g.*, Agreement Concerning Fiduciary

Engagements and Process Requirements for Employer Stock Transactions,

*Solis v. GreatBanc Trust Co.*, No. 12-1648 (C.D. Cal. Jun. 2, 2014), ECF No.

166-1, at 13.

63.    These requirements include, but are not limited to, that in

connection with a purchase or sale of employer securities that are not

publicly traded, the relevant fiduciary should:

a.  Hire a qualified valuation advisor;

b.  Prudently investigate the valuation advisor's qualifications;

c.  Take reasonable steps to determine that the valuation advisor receives complete, accurate, and current information necessary to value the employer securities;

d.  Prudently determine that its reliance on the valuation advisor's advice is reasonable before entering into any transaction in reliance on the advice;

e.  Not use a valuation advisor for a transaction that has previously performed work – including but not limited to a preliminary valuation – for or on behalf of the ESOP sponsor, any counterparty to the ESOP involved in the transaction, or any other entity that is structuring the transaction for any party other than the ESOP or its trustee; and

f.  Prepare a written analysis addressing the reason for selecting the particular valuation advisor, a list of all the valuation advisors considered, a discussion of the qualifications of the valuation advisors considered, a list of references checked and discussion of the references' views on the valuation advisors, whether the valuation advisor was the subject of prior criminal or civil proceedings; and a full explanation of the bases for concluding that the selection of the valuation advisor was prudent.

*Id.*

64.    In addition, in connection with the preparation of the valuation advisor's valuation report, the relevant fiduciary should ensure that the valuation advisor, among other things:

a.  Documents the individuals responsible for providing any projections reflected in the valuation report, and as to those individuals, conduct reasonable inquiry as to:

1.  Whether those individuals have or reasonably may be

> determined to have any conflicts of interest in regard to the ESOP; and
>
>     2. Whether those individuals serve as agents or employees of persons with such conflicts, and the precise nature of any such conflicts;
>
> b. Records in writing how the relevant fiduciary and the valuation advisor considered conflicts in determining the value of employer securities; and
>
> c. Document in writing an opinion as to the reasonableness of any projections considered in connection with the proposed transaction and explain in writing why and to what extent the projections arc or are not reasonable.

*Id*.

65.    Moreover, the relevant fiduciary should, in connection with any transaction involving the purchase or sale of employer securities that are not publicly traded:

> a. Take reasonable steps necessary to determine the prudence of relying on the financial statements provided to the valuation advisor;
>
> b. Critically assess the reasonableness of any projections; and
>
> c. Document in writing the bases for concluding that the information supplied to the valuation advisor was current, complete, and accurate.

*Id*.

## IV.    Non-Fiduciary Liability

66.    A "participant, beneficiary, or fiduciary may bring suit against an 'other person' under" ERISA 502(a)(3) (29 U.S.C. § 1132(a)(3)) who

"knowingly participates in a fiduciary's violation." *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 248–49 (2000).

67.    A participant may bring a section 502(a)(3) claim against an "other person" to obtain disgorgement of ill-gotten gains resulting from a breach of fiduciary duty or arising from a prohibited transaction. *In re Xerox Corp. ERISA Litig.*, 483 F. Supp. 2d 206, 216 (D. Conn. 2007) (citing *Harris Tr.*, 530 U.S. at 252).

68.    Participants may seek an accounting of unjustly obtained profits obtained by non-fiduciaries. *See Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936 (2020) (holding that a remedy seeking disgorgement of unlawful profits is an equitable remedy); Restatement (Third) of Restitution and Unjust Enrichment § 51 (2011) (court in equity may order accounting, requiring a defendant to account for its unjustly obtained profits).

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES AND COMMITTED PROHIBITED TRANSACTIONS

### I.    Defendants Caused the Plan to Purchase Inland Fresh at a Grossly Inflated Valuation

69.    All Defendants played a role in causing the Plan to purchase the Company for $92 million, a massively inflated number which dwarfed the Company's true value, based on incomplete and misleading information presented to valuation advisors without any semblance of an adequate

process.

70.    The $92 million Transaction price far exceeded any offer the
Company had ever received for its acquisition, and substantially outstripped
the value the Company itself disclosed shortly after the Transaction.

71.    The Company reported, in its Form 5500 submitted to the
Department of Labor dated March 25, 2017, that the fair value of the Plan's
Company stock was $6.449 million, or just 7% of the $92 million paid by the
Plan.

72.    The Selling Shareholder Defendants obtained the $92 million
Transaction price by intentionally and actively deceiving multiple valuation
advisors regarding the Company's assets and future business prospects,
benefiting themselves at the expense of the Plan and its participants. Trustee
Urbach accepted the Selling Shareholders' preferred valuation and approved
the Transaction on behalf of the Plan without conducting appropriate due
diligence. And the Committee did nothing to cure or prevent its co-
defendants' violations despite knowledge of the misconduct.

   **a. Defendants' fraudulent misrepresentations and flawed
   and conflicted process for valuing Inland Fresh.**

73.    Defendants failed to follow the process requirements described
above, which are regarded in the retirement plan industry as minimum

standards for ESOP fiduciaries to comply with their fiduciary duties and avoid prohibited transactions.

74.    Instead of obtaining an independent evaluation, Defendants solicited competing valuations from at least three advisors, essentially conducting a reverse auction to select the highest valuation.

75.    Defendants lacked any prudent or reliable process for obtaining an accurate and independent valuation of the Company. Instead, the Selling Shareholders' goal was to obtain the highest possible valuation to benefit themselves. To that end, the Selling Shareholders knowingly provided false and misleading information to valuation advisors, then selected the largest valuation from those that they received, knowing that it did not accurately reflect the Company's true fair market value and financial condition, in an effort to increase the Transaction purchase price to the maximum possible amount, without regard to the interests of Plan participants. And Trustee Urbach failed to employ an adequate and prudent process to obtain an independent valuation uninfluenced by the Selling Shareholders' desire to maximize the pecuniary benefit to themselves, to determine if the Selling Shareholders' chosen valuation was accurate and based on reliable information, or to investigate the reasons for the massive discrepancy among the valuations obtained by the Selling Shareholders.

76.    Upon receiving an initial valuation of approximately $50 million, the Selling Shareholders, and particularly majority owner CEO Knox, viewed the valuation as unfavorable to their interests. The Selling Shareholders then actively campaigned for larger valuations from other advisors, employing Company sales representatives and other executives to convince the valuation advisors to increase their business valuations based on inaccurate information.

77.    To the extent these allegations are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b), as Defendants contend, the following paragraphs will describe "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008).

78.    As noted, Defendant Knox and the other Selling Shareholders were displeased with the $50 valuation received from the first valuation advisor. Defendants Knox and Schneider then sought competing valuations from other advisors, including J.P. Morgan Chase. In connection with the J.P.

29

Morgan Chase valuation, Company representatives misrepresented two material elements of the Company's value: (1) revenue expectations, and (2) value of inventory.

79.    First, at Knox's direction, Company personnel presented false information regarding the Company's future sales prospects, falsely representing that the retail and value-add business segments of Inland Fresh and its subsidiaries would experience nearly $30 million in additional sales revenues from a variety of prospective customers, when in fact the Company had no reasonable expectation of procuring meaningful revenues from many of the listed prospects. Company personnel further represented that the Company's value-add business would double in value in the three-to-five years following the Transaction. These representations had no basis, and were false.

80.    Among other communications, these misrepresentations were contained in a 2016 email from an Inland Fresh Executive Vice President, Robert Novotny, to J.P. Morgan Chase personnel including Senior Vice President John Kopanski and Senior Vice President Craig A. Reese, in advance of a 2016 meeting between representatives of the Company and J.P. Morgan Chase. Novotny's email listed a total "Retail and Value-Added Sales Increase" figure of $29.6 million, including $7 million from Compass, $5

million from Sam's Club, $4 million from Publix, $3 million from Sprouts, $3 million from Canada, $2 million from Earth Fare, $1 million from Kroger, $1 million from Costco, $1 million from Aramark, and $1 million from the United Kingdom.

81.     These representations were false and misleading. Some of the listed customers—including Sam's Club, Sprouts, Compass, Canada, and the United Kingdom—were nothing more than sales leads with whom the Company had only very preliminary discussions; there was no basis for a good-faith belief that the Company would achieve the cited revenue figures. Among other things, the Selling Shareholders and Company personnel who communicated false and misleading sales projections on their behalf had no realistic expectation that Inland Fresh would achieve millions of dollars in sales to Sam's Club following the Transaction, that millions of dollars in new business from Sprouts and Compass would materialize, or that Inland Fresh would be able to successfully conduct business and obtain millions of dollars in revenue abroad, in Canada and the United Kingdom.

82.     The statements made in Novotny's email were then repeated orally by representatives of the Company's sales department in a 2016 meeting with J.P. Morgan Chase personnel, in order to advance the Selling Shareholders' goal of causing J.P. Morgan Chase to render a valuation

opinion that exceeded the Company's true fair market value.

83.    These misrepresentations misled J.P. Morgan Chase in determining the Company's expected future income, a critical factor in valuing the Company.

84.    Second, at Knox's direction, Company personnel misrepresented that the Company had in its inventory valuable products that were in fact nearly worthless. In truth, Inland Fresh's freezers were littered with out-of-date product. At the time of the valuation process, the Company had in its possession 200,000—300,000 pounds of five-year-old sockeye salmon filets that were worth no more than 25 cents per pound. Yet Company personnel falsely represented to J.P. Morgan Chase that these products were fresh and worth $15 per pound, a patently false statement which J.P. Morgan Chase relied upon in valuing the company.

85.    The misrepresentations discussed above regarding the Company's revenue projections and inventory value misled J.P. Morgan Chase in valuing the Company. As noted, initial business valuations prepared in connection with the Transaction suggested that the Company should be valued at approximately $50 million or less. Shortly after the Novotny email cited above and meeting between representatives of the Company and J.P. Morgan Chase in which Company personnel falsely

represented the Company's sales prospects and inventory value, J.P. Morgan Chase issued a valuation opinion that was far higher than the original $50 million figure, which formed the foundation for the ultimate $92 million Transaction price. Therefore, as a consequence of the fraud, the Selling Shareholders were able to inflate the Company's sales price by at least $40 million compared to the price that they would have received without the fraud.

86.    For his part, Trustee Urbach failed to engage in an adequate and prudent process to scrutinize the basis for the $92 million purchase price. "Although securing an *independent* assessment" is some evidence of a prudent investigation, "independent expert advice is not a 'whitewash'" or "a magic wand." *Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1996) (citing *Donovan v. Bierwirth,* 680 F.2d 263, 272 (2d Cir. 1982), and *Donovan v. Cunningham*, 716 F.2d 1455, 1474 (5th Cir. 1983)) (emphasis added). The trustee still must ensure that the advisor is sufficiently qualified and that its opinion is based on "complete and accurate information," and must "make certain that reliance on the expert's advice is reasonably justified under the circumstances." *Shay*, 100 F.3d at 1489.

87.    Accordingly, Trustee Urbach could not blindly rely on J.P. Morgan Chase's valuation opinion as a basis to conclude that the Company's

fair market value was $92 million and a reasonable price for the Plan to pay in the Transaction. Instead, Urbach remained obligated "to make an honest, objective effort to read the valuation, understand it, and question the methods and assumptions that do not make sense." *Shay*, 100 F.3d at 1490.

88.     Had Urbach made an honest, objective effort to assess the J.P. Morgan Chase valuation, he would have determined that it was not truly independent or based on complete and accurate information, but instead was based on misrepresentations from interested parties—the Selling Shareholders. Thus, an adequate investigation would have led Urbach to conclude that reliance on the J.P. Morgan Chase opinion was not "reasonably justified under the circumstances." *Shay*, 100 F.3d at 1489.

89.     At a minimum, a prudent and loyal trustee under the circumstances would have inquired with the Selling Shareholders as to the existence of other competing valuation reports. Upon discovering that another advisor had recently valued the Company at only $50 million, a prudent trustee would have investigated the basis for the discrepancy and would have determined that the subsequent valuation was much higher because it was based on false and fraudulent sales projections and inventory values that were not included in the earlier report. A prudent trustee acting solely in the interests of Plan participants would have then concluded that

the Company's stock did not represent adequate consideration for the $92 million purchase price and would have rejected the Transaction on the Plan's behalf, thereby preventing the Selling Shareholders' unjust enrichment and avoiding tens of millions of dollars in Plan losses.

### b. Defendants' history of obtaining outside bids for the Company.

90.    The Company and Selling Shareholders periodically received offers to purchase the Company from competitors and other entities in the years before the Transaction, but every bid was far smaller than the Transaction's $92 million purchase price.

91.    Defendants never seriously solicited any bids from outside entities as an alternative to proceeding with the Transaction.

92.    Defendants had no process whatsoever for soliciting outside bids from potential buyers of the Company.

93.     By causing the Transaction to take place at a grossly inflated valuation, Defendants caused the Plan and its participants to lose tens of millions of dollars in retirement income.

## II.    Non-Fiduciary Liability of Shareholder Defendants

94.    As alleged herein, the Selling Shareholders, Defendants Joel Knox, Bill Demmond, Chris Rosenberger, and Les Schneider, were Plan

fiduciaries.

95.    Additionally, even if the Selling Shareholders were not Plan fiduciaries (and they were), they are subject to appropriate equitable relief under 29 U.S.C. § 1132(a)(3), as knowing participants in fiduciary breaches and prohibited transactions. Appropriate equitable remedies may include an accounting, a constructive trust, restitution, or disgorgement of ill-gotten gains from the Transaction, or rescission of the Transaction.

96.    The Selling Shareholders knew that one or more Plan fiduciaries had failed to follow the minimum process requirements required for ESOP fiduciaries outlined herein.

97.    The Selling Shareholders knew that one or more Plan fiduciaries lacked any process for obtaining an accurate and independent valuation of the Company.

98.    The Selling Shareholders knew that they directed Company sales representatives and other Company executives to mislead valuation advisors by making false statements regarding the Company's projected revenues and inventory values.

99.    The Selling Shareholders knew that one or more Plan fiduciaries unjustifiably relied on the resulting valuation as a basis for approving the Transaction without adequately investigating its reliability.

100. The Selling Shareholders knew the Plan's fiduciaries, including Joel Knox, knowingly provided false information in support of the Company's valuation to valuation advisors to inflate the value of the Company in connection with the Transaction.

101. The Selling Shareholders knew that the Plan's fiduciaries never seriously solicited any bids from outside entities as an alternative to proceeding with the Transaction.

102. The Selling Shareholders knew the $92 million purchase price was a massively inflated number which dwarfed the Company's true value.

103. Despite knowledge of these breaches and violations, the Selling Shareholders proceeded to close the Transaction.

104. By knowingly participating in these breaches and violations, the Selling Shareholders are subject to appropriate equitable relief including accounting, disgorgement of any profits, restitution, or imposition of a constructive trust placed on Transaction proceeds (or funds traceable thereto), or other appropriate equitable relief.

105. On information and belief, each of the Selling Shareholders deposited his share of the proceeds from the Transaction in a personal account that continues to exist in the possession of each Selling Shareholder.

106. On information and belief, the balance of each of the personal

accounts into which the Transaction proceeds were deposited have remained above the amount of the total proceeds deposited therein.

## ADMINISTRATION EXHAUSTION IS INAPPLICABLE

### I.    Plaintiffs have no obligation to plead around this affirmative defense.

107.    Addressing a similar pre-suit exhaustion requirement under the Prisoner Litigation Reform Act, the Supreme Court squarely held that "failure to exhaust is an affirmative defense" and that plaintiffs "are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock*, 549 U.S. 199, 216 (2007). Defendants nevertheless asserted in their prior Rule 12(b)(6) motions that Plaintiffs were required to plead exhaustion. Plaintiffs strongly disagree. Nevertheless, Plaintiffs address the issue here out of an abundance of caution. Accordingly, should the Court sustain Plaintiffs' position that "failure to exhaust is an affirmative defense" and that Plaintiffs were "not required to specially plead or demonstrate exhaustion in their complaint[]," *Bock*, 549 U.S. at 216, the Court should treat this Amended Complaint as not having raised the issue and otherwise deny any subsequent Rule 12(b)(6) motion based on a purported failure to exhaust administrative remedies.

## II.    The Plan documents explicitly excused Plaintiffs from administrative claim procedures.

108.    As a general rule, "plaintiffs in ERISA actions must exhaust available administrative remedies before suing in federal court." *Bickley v. Caremark Rx, Inc.*, 461 F.3d 1325, 1328 (11th Cir. 2006) (quoting *Counts v. Amer. Gen'l Life & Acc. Ins. Co.*, 111 F.3d 105, 108 (11th Cir. 1997)). In the context of a claim for benefits due under the terms of an ERISA plan, *see* 29 U.S.C. § 1132(a)(1)(B), there is arguably a statutory basis for the exhaustion requirement, as ERISA requires that plans contain a procedure affording "a full and fair review" to "any participant whose claim for benefits *has been denied*," *Yates v. Symetra Life Ins. Co.*, ___ F.4th ___, 2023 U.S. App. LEXIS 4243, at *5–6 (8th Cir. Feb. 23, 2023) (quoting 29 U.S.C. § 1133(2)) (emphasis added). The statute contains no equivalent provision regarding a participant's claim that a fiduciary has violated ERISA's substantive provisions. Thus, the courts of appeals to consider the issue have overwhelmingly concluded that no judge-made exhaustion requirement applies to ERISA claims for breach of fiduciary duty. *See Hitchcock v. Cumberland Univ. 403(b) DC Plan*, 851 F.3d 552, 564 (6th Cir. 2017) (joining "the Third, Fourth, Fifth, Ninth, Tenth, and D.C. Circuits" in "hold[ing] that ERISA plan participants or beneficiaries do not need to exhaust internal

remedial procedures before proceeding to federal court when they assert

statutory violations of ERISA."); *see also Wallace v. Oakwood Healthcare,*

*Inc.*, 954 F.3d 879, 900 (6th Cir. 2020) (Thapar, J., concurring) (questioning

legitimacy of "ERISA's exhaustion requirement," a "troubling" rule which

courts "made up for policy reasons" despite having no basis in "the statute

Congress enacted"). But the Eleventh Circuit, in conflict with the conclusion

reached by seven of its sister circuits, holds that the "exhaustion

requirement applies equally to claims for benefits and claims for violation of

ERISA itself." *Bickley*, 461 F.3d at 1328 & n.6.

109.   Nevertheless, a plaintiff need only exhaust administrative

remedies when the benefit plan at issue contains such a requirement. *See id.*

at 1330 (plaintiff was required to "exhaust the available administrative

remedies *contained in the Plan* prior to filing suit in federal court") (emphasis

added). As the Supreme Court has emphasized, one of ERISA's central goals

is to enable every employee to "determine exactly what his rights and

obligations are under the plan" by "*examining the plan documents.*" *Curtiss-*

*Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995). Indeed, because the

entire "statutory scheme . . . 'is built around reliance on the face of written

plan documents,'" *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 101 (2013)

(quoting *Curtiss-Wright*, 514 U.S. at 83), the Supreme Court has repeatedly

40

"recognized the particular importance of enforcing plan terms as written,"

*Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 108 (2013). For

instance, "when the written plan documents make no mention of any review

process or administrative remedies that can be exhausted," a plan participant

"is not required to exhaust administrative remedies." *Yates*, 2023 U.S. App.

LEXIS 4243, at *7; *Wallace*, 954 F.3d at 885–88. Thus, the existence and

content of any exhaustion requirement depends on the terms of the plan

document at issue.

110.    Here, while the Plan document contains a section regarding

"Claims and Review Procedures," that provision informed participants that

filing an administrative claim was not required, but merely optional:

> While a Participant or Beneficiary *need not file a claim to receive a benefit* under the Plan, such a person *may* submit a written claim to the Committee or seek a review of the Committee's benefit determination. The Committee will afford the Participant or Beneficiary a full and fair review of such a request as provided in Supplement A.

Plan, Section 8.10 (Doc. 25-2 at 51) (emphasis added). The Summary Plan

Description contains a similar provision, informing participants that "you *do*

*not need to file a formal claim* to receive your benefit." Ex. 1 at 14 (emphasis

added). The Summary Plan Description further states that "you may file suit

in a federal court" if "Plan fiduciaries misuse the Plan's money," without

mentioning any threshold administrative claim requirement. *Id*. at 17.

111.   The claims in this case—seeking to recover the loss in value to a defined contribution plan and participants' accounts due to breaches of fiduciary duty—are claims to receive a benefit under the Plan. *Lanfear v. Home Depot, Inc.*, 536 F.3d 1217, 1222–23 (11th Cir. 2008). Thus, when Plaintiffs examined the Plan document and Summary Plan Description to "determine exactly" what their "obligations are under the plan," *Curtiss-Wright*, 514 U.S. at 83, the documents informed Plaintiffs that they "*need not file a claim*" under the Plan's claims and review procedures to receive the benefits they seek in this action. Because the Plan provides that an administrative claim was *not* required, the Court must "hold[] the parties to their mutual promises" as expressed in the Plan document. *McCutchen*, 569 U.S. at 98; *see also Yates*, 2023 U.S. App. LEXIS 4243, at *10 (declining to "impose on Yates a requirement to exhaust remedies that are not in the contract the parties entered").

## III.   Even if the Plan requires exhaustion—and it does not—numerous exceptions apply.

112.   Even if some tortured interpretation of the Plan could be viewed as imposing an exhaustion requirement, "a district court has the sound discretion 'to excuse the exhaustion requirement when resort to

administrative remedies would be futile or the remedy inadequate,' . . . or where a claimant is denied 'meaningful access' to the administrative review scheme in place." *Bickley*, 461 F.3d at 1328 (quoting *Perrino v. S. Bell Tel. & Tel. Co.*, 209 F.3d 1309, 1315 (11th Cir. 2000)). All of these reasons are present here. In addition, because the Administrator who would adjudicate an administrative claim is the ESOP Committee—a party to the dispute facing tens of millions of dollars in liability—requiring exhaustion under the circumstances here would violate Plaintiffs' Due Process rights.

### a.    **Inadequate remedy**

113.    No adequate remedy is available under the Plan's administrative review process. Plaintiffs bring suit under 29 U.S.C. § 1132(a)(2),[6] for relief under § 1109(a). *See supra*, ¶ 4. An action under § 1132(a)(2) is brought in a representative capacity "on behalf of the Plan itself." *Fuller v. Suntrust Banks, Inc.*, 744 F.3d 685, 695 (11th Cir. 2014). Thus, "the plan participant cannot seek to recover personal damages for misconduct, but must instead seek recovery that 'inures to the benefit of the plan as a whole.'" *Id.* (quoting *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 (1985)).

---

[6] Count IV is brought under § 1132(a)(3)(B), a "catchall" provision that applies to the extent the relief sought is unavailable under § 1132(a)(2). *See Varity Corp. v. Howe*, 516 U.S. 489, 507, 515 (1996).

114.    The text and structure of the statute make clear that adjudicating a claimed breach of fiduciary duty is a task for a court, not a plan administrator, and that the court alone has the authority to compel an adequate remedy. Indeed, federal district courts have "exclusive jurisdiction" over such claims. 29 U.S.C. § 1132(e)(1).

115.    As suggested by the title of § 1109(a), "Liability for breach of fiduciary duty," the "threshold question" in "every case charging breach of ERISA fiduciary duty" is whether the defendant "was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000); *see* 29 U.S.C. § 1002(21)(A); § 1102(a). Determining fiduciary status requires a "fact-intensive" inquiry. *Woods v. S. Co.*, 396 F. Supp. 2d 1351, 1365 (N.D.Ga. 2005). While the judicial system is well-equipped to handle such determinations, a plan administrator is not.

116.    If the defendant was acting as a fiduciary, the next question is whether the defendant "breache[d] any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter," 29 U.S.C. § 1109(a), such as the duties of loyalty and prudence under § 1104(a), co-fiduciary duties under § 1105(a), or transactional prohibitions under § 1106.

117.    A plan administrator lacks the resources and expertise to

competently resolve those questions. When a plan participant submits a

claim premised on enforcing the terms of a plan, *see* 29 U.S.C. § 1132(a)(1)(B),

the exhaustion requirement is sensible because an administrator can decide

the claim by simply reviewing the participant's medical records and

determining whether the terms of the plan provide coverage for the claim.

Judicial review is typically limited to the administrative record. *Blankenship*

*v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 (11th Cir. 2011). In contrast,

determining whether a fiduciary fulfilled its substantive obligations is not

simply a matter of interpreting the plan and reviewing a few documents.

Instead, the trier of fact considers the fiduciary's *conduct*,[7] to determine

whether the fiduciary "act[ed] solely in the interest of the participants" and

"employed the appropriate methods to investigate the merits of the

investment." *GIW Indus., Inc. v. Trevor, Stewart, Burton & Jacobsen, Inc.*,

895 F.2d 729, 732–33 (11th Cir. 1990); *see* 29 U.S.C. § 1104(a)(1)(A)–(B).

118.    Much like the question of fiduciary status, determining whether

a fiduciary fulfilled its duties is "inevitably fact intensive," *Tussey v. ABB,*

*Inc.*, 746 F.3d 327, 336 (8th Cir. 2014). The determination often depends not

---

[7] *E.g.*, *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 107 (2d Cir. 2021); *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014) *Pledger v. Reliance Tr. Co.*, 240 F. Supp. 3d 1314, 1321 (N.D. Ga. 2017).

only on voluminous documents, but also on resolving disputes between competing experts and judging witness credibility. In a recent trial on similar claims, the court emphasized that it was "difficult to draw the line" between acceptable and unlawful fiduciary conduct, and that "the distinction depends heavily on the credibility of witnesses." *Reetz v. Lowe's Cos., Inc.*, No. 18-75, 2021 U.S. Dist. LEXIS 195803, at *160–61 (W.D.N.C. Oct. 12, 2021), *appeal filed*, No. 21-2267 (4th Cir. Nov. 10, 2021). Another similar trial decision used the terms "credible" or "credibly" a total of 14 times. *Sacerdote v. New York Univ.,* 328 F. Supp. 3d 273, 282–83 nn.11–12, 16, 21–22, 24, 296, 304–06 & nn.67, 76, 309–10 & nn.106, 108 (S.D.N.Y. 2018). To determine whether a breach occurred, the court held an eight-day bench trial, heard from twenty witnesses, including five experts, and received over six hundred documents into evidence. *Id.* at 283.

119.   A plan's administrative process is simply incapable of replicating a federal court trial (which explains the lack of a statutory requirement that fiduciary breach claimants exhaust administrative channels before filing). The claim process here does not contemplate discovery or trial-like procedures. Instead, the Plan requires a participant to submit the claim in writing "on the appropriate claim forms," after which the Committee will notify the claimant of its decision within 90 days. *See* Plan, "Supplement A,"

§§ A-1, A-2 (Doc. 25-2 at 60). Any appeals of the initial decision are also written, with no provision for a testimonial hearing. *Id*., § A-5. Because the Plan contains no procedure that would have allowed Plaintiffs to obtain and present all of the evidence, including live testimony, necessary to prove a breach of fiduciary duty, no adequate remedy was available. Even if the Committee had the capacity to hold an administrative "trial," developing the evidence and preparing for such a trial would require significant resources that would then inevitably have to be duplicated after the dissatisfied party files suit in federal court. Such a wasteful process would undermine rather than advance the underlying policy reasons for the exhaustion requirement. *Cf. Bickley*, 461 F.3d at 1330 (exhaustion requirement intended to "minimize the cost of dispute resolution").

120.    Upon finding that a fiduciary breached its obligations, the court must then determine the "appropriate relief under section 1109." 29 U.S.C. § 1132(a)(2). Among other remedies, the breaching fiduciary "shall" be liable "to make good to such plan any losses to the plan resulting from each such breach." 29 U.S.C. § 1109(a). That determination is often based on expert testimony and "requires a comparison of the actual performance of the Plan and the performance that otherwise would have taken place" but for the breach. *GW Indus.*, 895 F.2d at 733 (quoting *Donovan v. Bierwirth*, 754 F.2d

1049, 1057 (2d Cir. 1985)). In the context of a claim "involving overpayment for ESOP assets, courts generally compute restitution damages . . . by deducting the fair market value of the stock from the amount the ESOP actually paid." *Brundle v. Wilmington Tr., N.A.*, 919 F.3d 763, 782 (4th Cir. 2019). Thus, "[t]o calculate the loss to an ESOP and compensate it for a fiduciary's ERISA violation, a court typically subtracts the stock's fair market value, as determined by the court, from the inflated price paid by the ESOP." *Id.* at 781. Again, this highly complex and technical question, requiring the adjudicator to resolve a battle of competing experts' opinions on the proper measures of damages, simply exceeds a plan administrator's capacity to competently determine.

121.   Even if a plan administrator theoretically could compute damages, the Committee here could not serve as an impartial adjudicator because it is among the parties accused of wrongdoing. *See supra*, ¶ 40. And even if the Committee members were somehow unswayed by the prospect of holding themselves personally liable for "tens of millions of dollars" in Plan losses, *id.* ¶ 93, a plan administrator simply has no legal authority to impose tens of millions of dollars in personal liability on other fiduciaries for violating federal law, which is the province of an Article III tribunal. Moreover, because the Committee members would have been asked to impose

such liability on the very Board members who appointed them, including the company's CEO, it is utterly inconceivable that Plaintiffs could have obtained the remedy they seek through administrative channels. Even if Plaintiffs theoretically could have somehow obtained an administrative decision holding the Defendants liable for "tens of millions of dollars" in Plan losses, the Administrator's decision would not be worth the paper it was written on. The Defendants could simply refuse to pay and assert that the administrator had no legal authority to render a judgment against them.[8] In contrast, if Plaintiffs obtain a judgment from a federal court, that judgment could be enforced by attaching the Defendants' personal assets. Accordingly, any remedy available from the Plan Administrator necessarily would have been inadequate.

122.    In addition to liability for plan losses, a breaching fiduciary is subject to disgorgement of any ill-gotten profits as well as "such other equitable or remedial relief as *the court* may deem appropriate." 29 U.S.C. § 1109(a) (emphasis added). For similar reasons as those stated above,

---

[8] That problem does not arise under § 1132(a)(1)(B), because the administrator has authority under the plan to pay the claim from the *plan's* assets. *See Hunt v. Hawthorne Assocs.*, 119 F.3d 888, 906–08 (11th Cir. 1997); *Griffin v. Lockheed Martin Corp.*, 157 F. Supp. 3d 1271, 1274 (N.D. Ga. 2015). In contrast, defendants in a § 1132(a)(2) action are "personally liable" to *restore* money *to* a plan from their personal assets. 29 U.S.C. § 1109(a).

distinguishing between legitimate profit, and illegitimate proceeds attributable to Defendants' wrongdoing, will require a complex determination exceeding a plan administrator's area of competence. If the administrator were to order the Defendants to disgorge tens of millions of dollars or to impose any other equitable remedy, the Defendants could simply ignore those requests and assert that under the plain language of § 1109(a), only a federal court can grant such relief.

123.    As to Count IV, the administrative review process again would have been inadequate. That claim seeks relief under § 1132(a)(3)(B), a "catchall" provision that applies to the extent the relief sought is unavailable under § 1132(a)(2), *Varity Corp. v. Howe*, 516 U.S. 489, 507, 515 (1996), such as if the Selling Shareholders were not "fiduciaries" within the meaning of ERISA. Even if not subject to fiduciary liability under § 1132(a)(2), the Selling Shareholders can be held liable under § 1132(a)(2)(B) for "knowing participation" in a breach of fiduciary duty or prohibited transaction. *See Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 246, 250–51, 253 (2000); *supra*, ¶¶ 94–106, *infra*, ¶¶ 180–84. In addition to the issues in Counts I–III as to whether any fiduciary breached its duties or caused a prohibited transaction, the knowing participation claim will require additional fact-intensive inquiries into whether each of the Selling

Shareholders "had actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Harris Tr.*, 530 U.S. at 251.

124.  If liability is established, the Selling Shareholders will then be subject to "appropriate equitable relief," including possible rescission of the Transaction, a constructive trust, "restitution of the property (if not already disposed of) or disgorgement of proceeds (if already disposed of), and disgorgement of the [Selling Shareholders'] profits derived therefrom." *Id.* at 250. Lacking the subpoena power of a federal court, the Administrator would be powerless to investigate the Selling Shareholders' financial affairs as would be necessary to determine the amounts subject to restitution and disgorgement, assuming *arguendo* that the Administrator is even competent to undertake that inquiry. As noted above, it is inconceivable that the Committee here would attempt to order the Selling Shareholders, including the company's CEO and Board members who appointed the Committee, to disgorge the tens of millions of dollars needed to make the Plan whole. Regardless of the utter implausibility of the Committee ordering the CEO and other Board members to turn over tens of millions of dollars to the Plan, if the Committee somehow endeavored to do so, the Selling Shareholders again could simply refuse to comply on the ground that the Committee has no authority to order such equitable relief. Indeed, instead of complying with the

Committee's mandate, the Selling Shareholders, as members of the Board, could simply replace the Committee.

125.   It is no answer to say that if the Committee had been "given an opportunity to address [Plaintiffs'] claim on behalf of the Plan," the Committee could have "provide[d] the remedy [Plaintiffs] seek[] by pursuing a claim against" the other Defendants. *Cf. Bickley*, 461 F.3d at 1330 n.9. Unlike the administrator in *Bickley*, who was not among the defendants, the Committee here is a defendant. *See supra*, ¶ 40. It is implausible that the Committee would have sued itself for breach of fiduciary duty. As previously discussed, it is inconceivable that the Committee would vigorously prosecute a complaint accusing the company's CEO and other Board members who appointed the Committee of having perpetuated tens of millions of dollars of fraud. Even if the Committee theoretically could file such a suit, the Committee's conflict of interest as a co-defendant would preclude it from adequately representing the interests of Plaintiffs and other Plan participants. *See Hansberry v. Lee*, 311 U.S. 32, 45 (1940) ("Such a selection of representatives for purposes of litigation, whose substantial interests are not necessarily or even probably the same as those whom they are deemed to represent, does not afford that protection to absent parties which due process requires."). Were the Committee to pursue a suit, it would present an acute

risk of "the fraudulent and collusive sacrifice of the rights of" Plaintiffs and Plan participants by parties (the Committee and its co-defendants) who "have an interest in the outcome of the litigation in conflict with that of the" absent parties. *Id*. Any such judgment would be highly vulnerable to collateral attack. *See Juris v. Inamed Corp.*, 685 F.3d 1294, 1314 (11th Cir. 2012).

126.   Moreover, requiring participants to grant the Committee the "right of first refusal" over a § 1132(a)(2) claim is inconsistent with the statute. Congress granted "a participant, beneficiary or fiduciary," as well as the Secretary of Labor, *equal* authority to file a civil action under 29 U.S.C. § 1132(a)(2). Nothing in the statute suggests that a "fiduciary" receives priority before "a participant" may file suit. Indeed, the absence of such a requirement shows that Congress understood that requiring a participant to first ask the wrongdoing fiduciary to sue itself would be an exercise in futility.

127.   For all of the reasons stated in this section, no adequate remedy was available through the Plan's administrative procedures.

**b.      The Administrator denied Plaintiffs meaningful access to the review process by refusing to produce relevant evidence, which also shows that pursuing a claim would have been an exercise in futility**

128.   The Plan's "Claims and Review Procedures" place the burden on

the participant to provide the Committee with the information needed to prove an entitlement to the claimed benefit. *See* Plan, "Supplement A," § A-2 (discussing claimant's obligation to provide the "information needed" for the Committee to decide the issues); *id*., §§ A-4, A-5 (claimant may submit additional "documents, records, and other information").

129.   Here, 18 months before filing suit, Plaintiff Mercker requested from Eric Sussman, identified as the Plan's Administrator on the Plan's annual reports (Doc. 25-3 at 2), numerous documents that would have been relevant to support an administrative claim for benefits. May 28, 2021 letter to Plan Administrator, Ex. 2, hereto. The requested materials included contracts with service providers such as the Trustee, any "valuation or appraisal reports" related to "the price paid" by the Plan for Inland stock, "the information provided" to the entities that prepared the valuation reports, any consultant reports considered by Plan fiduciaries in approving the transaction, the identities of each fiduciary to the Plan, and "documentation of the fiduciary process" (*e.g.*, meeting minutes). *Id*.

130.   Instead of a response from Plan Administrator Sussman, Defendant Inland responded through counsel. June 22, 2021 letter, Ex. 3 hereto. The company provided only a few basic documents, otherwise refusing to produce to Plaintiff Mercker "many documents she requests." *Id*. The

company explicitly refused to provide agreements with the "ESOP trustee,"
consultants, or counsel. *Id*. The company also explicitly refused to produce
any "valuation reports relating to the ESOP." *Id*. The company also refused to
produce the requested meeting minutes, which would have provided some
insight into the fiduciaries' conduct.

131.    By refusing to produce evidence that Plaintiffs would have
needed to support a meaningful administrative claim seeking to have tens of
millions of dollars restored to the Plan, the Company denied Plaintiffs
"meaningful access" to the Plan's administrative review procedures, which
warrants relief from any exhaustion requirement. *See Curry v. Contract
Fabricators, Inc. Profit Sharing Plan*, 891 F.2d 842, 846 (11th Cir. 1990). As
noted, proving a breach of fiduciary duty requires evidence of the fiduciary's
conduct. *See supra*, ¶ 113 & n.6. Those facts "tend systemically to be in the
sole possession of defendants" before discovery. *Braden v. Wal-Mart Stores,
Inc.*, 588 F.3d 585, 598 (8th Cir. 2009)). *Pension Benefit Guar. Corp. v.
Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 719–20 (2d Cir. 2013) (recognizing
that "details about a fiduciary's methods and actual knowledge tend to be 'in
the sole possession of [that fiduciary]'") (quoting *Braden*, 588 F.3d at 598).
ERISA plan participants "generally lack the inside information necessary to
make out their claims in detail unless and until discovery commences." *Allen*

*v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016) (quoting *Braden*, 588 F.3d at 598). By depriving Plaintiffs of evidence such as meeting minutes and valuation reports which could have been used to show a potential flaw in the fiduciary process and damage to the Plan, Defendants effectively took the position that if Plaintiffs wished to obtain the requested information, they would need to file suit and pursue discovery. In so doing, Defendants denied Plaintiffs meaningful access to the administrative claim process.

132.   And because the company refused to turn over information in its possession that Plaintiffs needed to substantiate their claim that the Plan had lost tens of millions of dollars due to Defendants' misconduct, filing an administrative claim without such supporting information plainly would have been an exercise in futility. Indeed, the refusal to cooperate with a simple informational request shows that the company would have summarily rejected any administrative claim, rendering any such claim futile.

**c.    An administrative claim likely would have violated Due Process**

133.   In addition to the factors above, any administrative claim adjudication likely would have been unconstitutional.

134.   As noted, the Plan Administrator who would have decided the administrative claim is the Committee, a Defendant in this action facing

potential liability of tens of millions of dollars. Plan, §§ 8.2, 8.10, Supplement A (Doc. 25-2 at 49, 60–62); *supra*, ¶ 40.

135.    When a plan document vests a plan administrator "with discretion" to decide benefits claims, a court reviews a denial of benefits under a highly "deferential arbitrary and capricious standard." *Blankenship*, 644 F.3d at 1355. Moreover, "[r]eview of the plan administrator's denial of benefits is limited to consideration of the material available to the administrator at the time it made its decision." *Id*. at 1354.

136.    As noted, the Administrator, through the company's lawyer, refused to produce the material that Plaintiffs would have needed to prove that the Plan was entitled to recover tens of millions of dollars in additional benefits. Thus, if Plaintiffs had submitted an administrative claim, the Committee surely would have rejected the claim as lacking supporting documentation that the Plan in fact was entitled to tens of millions of dollars in additional benefits.

137.    If Plaintiffs then filed suit to challenge the administrative denial, the court's review would be limited to a threadbare administrative record, with Plaintiffs having received no opportunity for discovery after the company flatly refused Plaintiffs' request to turn over relevant evidence. *See Blankenship*, 644 F.3d at 1354. If the court were then to review the

Administrator's decision deferentially,[9] Plaintiffs would be hard pressed to show that the Administrator lacked a reasonable basis to deny the claim due to inadequate evidentiary support. *See id.* at 1355. However, any judicial decision made in deference to a biased party-defendant like the Committee would trample Plaintiffs' constitutional right to an impartial adjudication. *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 626 (1993) (Due Process Clause prohibits adjudicator from deferring to the biased decisions of a party litigant).

## THIS IS A "CASE OF FRAUD OR CONCEALMENT"

138.   In any "case of fraud *or* concealment" under ERISA, the action "may be commenced not later than six years after the date of discovery of such breach or violation." 29 U.S.C. §1113 (emphasis added). Under the plain statutory language, this extended period applies in two distinct situations: (1) when the underlying claims involve allegations of fraud, or (2) when the defendants concealed their misconduct (regardless of whether the underlying claims involve fraud). *Fulghum v. Embarq Corp.*, 785 F.3d 395, 415 (10th Cir. 2015); *Turner v. Allstate Ins. Co.*, No. 13-685, 2016 U.S. Dist. LEXIS 132111, at *23–32 (M.D. Ala. Sep. 27, 2016). Here, the six-year limitations period

---

[9] Plaintiffs do not concede that the Plan document in fact vests the Committee with discretion.

applies under either rationale.

139.    First, Plaintiffs' claims sound in fraud. The foundation of the inflated Transaction price was a valuation report prepared in direct reliance on knowing misrepresentations of material fact by one or more Defendants regarding the company's sales prospects and the value of its inventory. Plaintiffs did not discover the fraud—and hence did not discover that the underlying facts constituted breaches of fiduciary duty, prohibited transactions, and that the Plan had been harmed—until September 2022, shortly before filing this action.

140.    Second, Defendants concealed their misconduct. Under ERISA, courts often must look to "[t]he common law of trusts, which offers a starting point for analysis." *Harris Tr.*, 530 U.S. at 250; *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). At common law, one who has a duty to disclose "because of a fiduciary or other similar relation of trust and confidence" commits fraud by "fail[ing] to disclose material information" that the beneficiary is entitled to know. *Chiarella v. United States*, 445 U.S. 222, 228 (1980); *Lenz v. Assoc. Inns & Restaurants Co of Am.*, 833 F. Supp. 362, 372 (S.D.N.Y. 1993) ("[F]raudulent concealment occurs if the party under the fiduciary duty fails to meet its obligations to inform the other party of facts underlying the claim."); Restatement (Second) of Trusts §173, comment d (1959) (trustee has

duty to disclose information the beneficiary needs to know for his protection).

141.   Here, Defendants hindered Plaintiffs from discovering the basis of their claims. As fiduciaries to the Plan, the Committee, Trustee Urbach, and the Selling Shareholders had a duty to disclose material facts that Plaintiffs needed to know to understand that their rights had been violated and to protect the Plan and their retirement assets. Among other things, each Defendant knew, or in the exercise of reasonable diligence should have known, *inter alia*, that the Plan paid an inflated price in the Transaction, that the valuation report was based on fraudulent misrepresentations regarding the Company's inventory and sales prospects, and that the Trustee and Committee had no semblance of a prudent or diligent process for verifying that the valuation was accurate, fair to the Plan, or in the best interests of the Plan's participants. Yet none of the Defendants disclosed those facts to Plaintiffs.

142.   Defendant Urbach holds himself out as an "independent" fiduciary, creating the impression that he is unbiased and free from conflicts of interest that might prevent him from acting in the best interest of Plaintiffs and the Plan. In fact, Urbach is profoundly conflicted because the Selling Shareholders as Board members could cause the Plan to terminate Urbach if they disagreed with his actions. Thus, Urbach had a powerful

financial incentive to retain the Plan's business by favoring the Selling

Shareholders' interests at the expense of the Plan by approving an inflated

sales price for the Transaction. Defendants concealed this information from

Plaintiffs by failing to disclose it, and the company affirmative concealed

underlying facts by explicitly refusing to produce its contract with "the ESOP

trustee." Ex. 3. These actions and omissions prevented Plaintiffs from

discovering material facts supporting their claims.

## CLASS ACTION ALLEGATIONS

143.   29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of

the Plan to bring an action individually on behalf of the Plan to enforce a

breaching fiduciary's liability to the plan under 29 U.S.C. § 1109(a). 29 U.S.C.

§ 1132(a)(3) likewise authorizes any participant to obtain equitable relief on

behalf of the Plan to redress ERISA violations.

144.   In the alternative, although class certification is not strictly

required to obtain the plan-wide remedies authorized by 29 U.S.C. §

1132(a)(2) and 29 U.S.C. § 1132(a)(3)(B), Plaintiffs may seek class

certification to enhance the Due Process protections of unnamed participants

and beneficiaries. Plaintiffs would seek to certify, and to be appointed as

representatives of, the following class:

All participants and beneficiaries of the Inland Fresh Seafood
Corporation of America, Inc. Employee Stock Ownership Plan
Plan from November 25, 2016 through the date of judgment,
excluding the Defendants.

145.   This action meets the requirements of Rule 23 and is certifiable

as a class action for the following reasons:

  a.   The Class includes over 500 members and is so numerous
that joinder of all its members is impracticable.

  b.   There are questions of law and fact common to this Class
because the Defendants owed fiduciary duties to the Plan and to all
participants and beneficiaries and took the actions and omissions
alleged herein as to the Plan and not as to any individual participant.
Thus, common questions of law and fact include the following, without
limitation: who are the fiduciaries liable for the remedies provided by
29 U.S.C. § 1109(a); whether Defendants breached their fiduciary
duties or caused a prohibited transaction in each respect alleged
herein; what are the losses to the Plan resulting from each breach or
violation; whether any Defendant who did not act as a fiduciary is
subject to liability as a non-fiduciary; and what Plan-wide equitable
and other relief the court should impose to remedy Defendants'
misconduct.

  c.   Plaintiffs' claims are typical of the claims of the Class
because each Plaintiff was a participant during the proposed class
period, the claims involve Defendants' plan-level conduct direct to the
Plan as a whole and all participants, and all participants were exposed
to and harmed by Defendants' misconduct.

  d.   Plaintiffs are adequate representatives of the Class because
they were participants in the Plan during the class period, have no
interest that is in conflict with absent class members, are committed to
the vigorous representation of the Class, and have engaged experienced
and competent attorneys to represent the Class.

e.    Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan, and (B) adjudications by individual participants and beneficiaries regarding these claims and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

146.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

147.   Plaintiffs' counsel, Schlichter Bogard & Denton, LLP, will fairly and adequately represent the interests of the Class and is best able to

represent the interests of the Class under Rule 23(g).

    a.    Schlichter Bogard & Denton has been appointed as class counsel in numerous other ERISA class actions regarding defined contribution plans. As Judge Charles A. Pannell, Jr. of this Court wrote, "Courts across the country have recognized the reputation, skill, and determination of Class Counsel in pursuing relief on behalf of retirement plan participants. This Court agrees." *Henderson v. Emory Univ.*, Civil Action No. 16-2920-CAP, 2020 U.S. Dist. LEXIS 218676, at *9 (N.D. Ga. Nov. 4, 2020).

    b.    As Chief Judge Michael J. Reagan of the Southern District of Illinois recognized in approving a settlement which was reached on the eve of trial after eight years of litigation, resulting in a $62 million monetary recovery and very substantial affirmative relief to benefit the Plans, the firm had shown "exceptional commitment and perseverance in representing employees and retirees seeking to improve their retirement plans[.]" *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S. Dist. LEXIS 93206, at *4–5 (S.D. Ill. July 17, 2015). In that same case, Judge Reagan recognized that the law firm of "Schlichter, Bogard & Denton has had a humungous impact over the entire 401(k) industry, which has benefited employees and retirees throughout the entire country by bringing sweeping changes to fiduciary practices." *Abbott*, 2015 U.S. Dist. LEXIS 93206, at *9 (internal quotations omitted).

    c.    Other courts have made similar findings: "It is clear to the Court that the firm of Schlichter Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S. Dist. LEXIS 166816 at 8 (N.D. Ill. June 26, 2012).

    d.    U.S. District Court Judge Harold A. Baker acknowledged the significant impact of the firm's work by stating that as of 2013 the nationwide "fee reduction attributed to Schlichter Bogard & Denton's fee litigation and the Department of Labor's fee disclosure regulations approach *$2.8 billion in annual savings* for American workers and retirees." *Nolte v. Cigna Corp.*, No. 2:07-cv-2046-HAB-DGB, 2013 U.S. Dist. LEXIS 184622, at *6 (C.D. Ill. Oct. 15, 2013).

d.      After a full trial of an ERISA case, resulting in a $36.9 million judgment for the plaintiffs that was affirmed in part by the Eighth Circuit, *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014), the district court, in awarding attorney's fees, concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). Following remand, the district court again awarded Plaintiffs' attorneys' fees, emphasizing the significant contribution Plaintiffs' attorneys have made to ERISA litigation: "Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards." *Tussey v. ABB, Inc.,* No. 06-4305, 2015 U.S. Dist. LEXIS 164818 at 7–8 (W.D. Mo. Dec. 9, 2015).

e.      On November 3, 2016, Judge Michael Ponsor of the United States District Court for the District of Massachusetts found that by securing a $30.9 million settlement, Schlichter Bogard & Denton had achieved an "outstanding result for the class," and "demonstrated extraordinary resourcefulness, skill, efficiency and determination." *Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Doc. 144 at 5 (D. Mass. November 3, 2016).

f.      Schlichter Bogard & Denton also handled *Tibble v. Edison International*, in which the Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" 135 S. Ct. at 1829. The firm likewise handled *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022), again obtaining a unanimous decision from the Supreme Court in an ERISA case on behalf of retirement plan participants.

g.      The firm's work in ERISA class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016);[10] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar.

---

[10] https://perma.cc/YA2C-4QAA (https://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.)

29, 2014);[11] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015);[12] Floyd Norris, *What a 401(k) Plan Really Owes Employees*,  N.Y. TIMES (Oct. 16, 2014);[13] Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015);[14] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); [15] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[16] Mark Miller*, Are 401(k) Fees Too High? The High-Court May Have an Opinion*, REUTERS (May 1, 2014);[17] Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct. 2, 2014).[18]

---

[11] https://perma.cc/CUV4-R8C5 (http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.)

[12] https://perma.cc/9AL9-WMR5 (http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.)

[13] https://perma.cc/FN4Y-GPEH (http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.)

[14] https://perma.cc/86FY-JKDG (http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.)

[15] https://perma.cc/HUZ6-DZTT (https://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.)

[16] https://perma.cc/2DXU-4GP4 (https://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.)

[17] https://perma.cc/PJ8T-4FDJ (http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.)

[18] https://perma.cc/CKJ4-ZK9R (http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.)

## COUNT I

## Breach of Fiduciary Duties—29 U.S.C. § 1104(a)(1)(A) & (B)
## (All Defendants)

148.   Plaintiffs restate and incorporate the allegations in paragraphs
2–4, 8–42, 62–65, 69–93, and 138–42.

149.   This Count alleges breach of fiduciary duties against all
Defendants: Inland Fresh, each of the four Selling Shareholders, Trustee
Urbach, and the Committee.

150.   These Defendants were required to discharge their duties with
respect to the Plan solely in the interest of, and for the exclusive purpose of
providing benefits to, Plan participants and beneficiaries, defraying
reasonable expenses of administering the Plan, and by acting with the care,
skill, prudence, and diligence required by ERISA.

151.   Based on the factual allegations incorporated herein, all
Defendants breached their duties under 29 U.S.C. § 1104(a)(1). These
breaches include but are not limited to the following:

a. All Defendants failed to take reasonable steps to determine that
they received complete, accurate, and current information
necessary to value the Company's stock;

b. All Defendants failed to conduct a reasonable inquiry concerning
whether the individuals responsible for providing the Company's
financial projections (a) had conflicts of interest in regards to the
Plan, and/or (b) served as agents or employees of persons with

such conflicts;

c. All Defendants either failed to adequately investigate or evaluate the reasonableness of the financial projections considered in connection with the Transaction or deliberately provided financial projections that they knew to be unreasonable;

d. All Defendants failed to take reasonable steps necessary to determine the prudence of relying on the Company's financial statements;

e. All Defendants caused the Plan to pay more than fair market value for Company stock;

f. All Defendants failed to conduct a thorough and independent review and adequately consider whether the Transaction was in the best interests of Plan participants;

g. All Defendants caused the caused the Plan to take on excessive debt in connection with the Transaction;

h. All Defendants failed to undertake an adequate and independent valuation of Company stock prior to the Transaction;

i. All Defendants failed to adequately consider all material facts in negotiating the ESOP Transaction; and

j. All Defendants failed to adequately remedy the ESOP's overpayment for Company stock at any time between November 2016 and the present.

152.   Under 29 U.S.C. § 1109(a), each Defendant is jointly and severally liable to restore all losses to the Plan resulting from any breach of duty, must restore to the Plan any profits made through the use of Plan assets, and is subject to other appropriate equitable or remedial relief.

153.   Based on the factual allegations incorporated herein, each

Defendant knowingly participated in the breaches of the other Defendants, knowing that such acts were breaches. In addition, based on those factual allegations, each Defendant knowingly participated in the breaches of the other Defendants, each Defendant enabled the other Defendants to commit breaches by failing to lawfully discharge their own fiduciary duties, knew of the breaches by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breaches. Thus, each Defendant is liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT II

### Prohibited Transactions—29 U.S.C. § 1106(a)-(b)
### (All Defendants)

154.  Plaintiffs restate and incorporate herein the allegations of paragraphs 2–4, 8–42, 62–65, 69–93, and 138–42.

155.  This Count alleges liability for a prohibited transaction against all Defendants: Inland Fresh, each of the four Selling Shareholders, Trustee Urbach, and the Committee.

156.  Section 1106(a)(1) prohibits transactions between a plan and a "party in interest," and provides as follows:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> > (A)   sale or exchange, or leasing, of any property between the plan and a party in interest;
> > (B)   lending of money or other extension of credit between the plan and a party in interest;
> > (C)   furnishing of goods, services, or facilities between the plan and a party in interest;
> > (D)   transfer to, or use by or for the benefit of a party in interest, of any assets of the plan …

29 U.S.C. § 1106(a)(1).

157.   Congress defined "party in interest" to encompass "those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries," such as employers, their owners, officers, and directors, other fiduciaries, and service providers. *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 242 (2000); 29 U.S.C. § 1002(14).

158.   As alleged herein, the Company and each of the four Selling Shareholders are parties in interest on numerous independent grounds. 29 U.S.C. § 1002(14)(A), (B), (C), (E), (G), (H).

159.   The Transaction was between the Plan and parties in interest, the Company and its four Selling Shareholders.

160.   As alleged herein, the Transaction was caused by all Defendants in their capacities as fiduciaries to the Plan.

161.   Based on the factual allegations incorporated herein, the Transaction constitutes a transaction between the Plan and a party-in-interest in violation of 29 U.S.C. § 1106(a)(1)(A)–(D).

162.   Based on the factual allegations incorporated herein, the Plan paid far more than fair market value for the Company's stock.

163.   29 U.S.C. § 1106(b), forbids plan fiduciaries from "act[ing] in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants," or "deal[ing] with the assets of the plan in [their] own interest or for [their] own account," or "receiv[ing] any consideration for [their] own personal account[s] from any party dealing with such plan in connection with a transaction involving the assets of the plan."

164.   The Company and the Selling Shareholders dealt with the assets of the Plan in their own interest and for their own accounts, and received consideration for their own personal accounts from the Plan in connection with the Transaction, by causing the Plan to acquire Company stock at grossly inflated values. This benefited the Company and the Selling Shareholders to the detriment of the Plan.

165.   Defendant Urbach and the ESOP Committee acted on behalf of the Selling Shareholders and/or the Company in connection with the

Transaction by causing the Plan to acquire Company stock at grossly inflated values. This benefited the Company and the Selling Shareholders to the detriment of the Plan, even though Defendant Urbach and the ESOP Committee were required to serve prudently and solely in the interest of the Plan in connection with any such transaction.

166.   Under 29 U.S.C. § 1109(a), each Defendant is jointly and severally liable to restore all losses to the Plan resulting from these prohibited transactions, is subject to restitution or disgorgement of all proceeds of these prohibited transactions, and is subject to other appropriate equitable or remedial relief.

167.   Based on the factual allegations incorporated herein, each Defendant knowingly participated in these transactions, enabled the other Defendants to cause the Plan to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy, prevent, or discontinue the transactions. Thus, under 29 U.S.C. § 1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

## COUNT III

### Failure to Monitor Fiduciaries
### (Against Defendants Inland Fresh Seafood Corporation of America, Inc., Joel Knox, Bill Demmond, Chris Rosenberger, Les

**Schneider, and the Inland Fresh Seafood Corporation of America, Inc. ESOP Committee)**

168.  Plaintiffs restate and incorporate the allegations contained in paragraphs 2–4, 8–42, 62–65, 69–93, and 138–42.

169.  This Count alleges breach of fiduciary duties against Defendants Inland Fresh Seafood Corporation of America, Inc., Joel Knox, Bill Demmond, Chris Rosenberger, Les Schneider, and the Inland Fresh Seafood Corporation of America, Inc. ESOP Committee.

170.  Inland Fresh acts through its Board of Directors, which is authorized to designate a person or a committee to act on behalf of the Plan.

171.  Inland Fresh, through its Board of Directors, has created and controls the membership of the ESOP Committee.

172.  At all relevant times, Joel Knox, Bill Demmond, and Chris Rosenberger, and Les Schnieder were members of the Inland Fresh Board of Directors.

173.  The ESOP Committee is the Plan's administrator under 29 U.S.C. § 1002(16)(A)(i). It is also the named fiduciary of the Plan with authority to control and manage the operation and administration of the Plan, in accordance with 29 U.S.C. § 1102(a). Thus, the ESOP Committee was obligated to monitor the performance of any service providers and co-

fiduciaries, including Trustee James R. Urbach.

174.   Given that Inland Fresh has overall responsibility for the oversight of its plan, all Defendants named in this count had a fiduciary responsibility to monitor the performance of the other fiduciaries, including those individuals who were delegated fiduciary responsibility with respect to the Plan.

175.   A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the purchase, investment, and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

176.   To the extent any of Inland Fresh's fiduciary responsibilities were delegated to another fiduciary, its monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently, loyally, in good faith, and in compliance with ERISA's prohibited transaction requirements.

177.   Inland Fresh, Joel Knox, Bill Demmond, Chris Rosenberger, Les Schneider, and the Inland Fresh Seafood Corporation of America, Inc. ESOP Committee breached their fiduciary monitoring duties by, among other things:

    a.  Failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan grossly overpaid for the Company's stock, thereby suffering enormous losses as a result of their appointees' imprudent and disloyal actions and omissions with respect to the Plan;

    b.  Failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary that the appointees' process was plainly inadequate to satisfy ERISA standards;

    c.  Failing to ensure that the monitored fiduciaries had prudent processes in place; and

    d.  Failing to remove appointees whose performance was inadequate.

178.  Had Defendants Inland Fresh, Joel Knox, Bill Demmond, Chris Rosenberger, Les Schneider, and the Inland Fresh Seafood Corporation of America, Inc. ESOP Committee discharged their fiduciary monitoring duties with prudence and loyalty as described above, the Transaction would not have occurred at a grossly inflated price, and the losses suffered by the Plan and its participants would have been avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, and the Plaintiffs and the other Class members, lost tens of millions of dollars of their retirement savings.

179.  Each Defendant named in this Court is jointly and severally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count,

must restore to the Plan any profits made through the use of Plan assets, and is subject to other equitable or remedial relief as appropriate.

## COUNT IV

### Non-fiduciary Liability – 29 U.S.C. § 1132(a)(3)(B) (Against the Selling Shareholders)

180.    Plaintiffs restate and incorporate the allegations contained in paragraphs 94–106 and 138–42.

181.    As alleged herein, the Selling Shareholders are Plan fiduciaries. But to the extent relief is unavailable from any Selling Shareholder under §§ 1109(a) and 1132(a)(2) on the ground that such Shareholder was not acting as an ERISA "fiduciary" when taking the action subject to complaint, each such Shareholder remains subject to "appropriate equitable relief" under ERISA 502(a)(3) (29 U.S.C. § 1132(a)(3)), ERISA's catchall remedial provision which has no limit on the universe of possible defendants. Appropriate equitable remedies may include a constructive trust, restitution, disgorgement, or rescission.

182.    Based on the facts alleged in paragraphs 94–106 and incorporated into paragraphs 149–51, the Selling Shareholders are subject to appropriate equitable relief because they knowingly participated in the breaches of fiduciary duty alleged herein. *Harris Tr.,* 530 U.S. at 248–49

(2000); *In re Xerox Corp. Erisa Litig.*, 483 F. Supp. 2d at 216.

183.   In addition, based on the facts alleged in paragraphs 94–106 and incorporated into paragraphs 158–65, the Selling Shareholders are subject to appropriate equitable relief because they knowingly participated in prohibited transactions. *Harris Tr.,* 530 U.S. at 248–49 (2000); *In re Xerox Corp. Erisa Litig.*, 483 F. Supp. 2d at 216.

184.   As alleged above, the proceeds that Selling Shareholders received from the Transaction were deposited in the personal accounts of the Selling Shareholders and remain in their possession. Plaintiffs seek appropriate equitable relief from the Selling Shareholders, including a constructive trust over or restitution of the proceeds, or disgorgement of any ill-gotten gains they received in connection with the Transaction.

## JURY TRIAL DEMANDED

Under Federal Rule of Civil Procedure 38 and the Constitution of the United States, Plaintiffs demand a trial by jury. Alternatively, Plaintiffs request an advisory jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- Find and declare that each Defendant has breached their fiduciary duties as described above;

- Find and adjudge that each Defendant is personally and jointly and severally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- Determine the fair market value of the Transaction for purposes of calculating Plan losses under 29 U.S.C. § 1109(a);

- Order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plans under 29 U.S.C. § 1109(a);

- Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- Order an accounting of all wrongfully obtained funds and profits generated from the Transaction;

- Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- Order disgorgement of all wrongful profits generated from the Transaction;

- Order rescission of the Transaction, to the extent doing so is necessary to make the Plan's participants whole;

- Reform the Plan;

- Certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter Bogard & Denton, LLP as Class Counsel;

- Award to the Plaintiffs and the Class their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant other equitable or remedial relief as the Court deems appropriate.

March 15, 2023                    Respectfully submitted,

                                  /s/ Andrew D. Schlichter
                                  SCHLICHTER BOGARD & DENTON, LLP
                                  Andrew D. Schlichter*
                                  Heather Lea*
                                  Alexander L. Braitberg*
                                  100 South Fourth Street, Ste. 1200
                                  St. Louis, MO 63102
                                  Phone: (314) 621-6115
                                  Fax: (314) 621-5934
                                  aschlichter@uselaws.com
                                  hlea@uselaws.com
                                  abraitberg@uselaws.com
                                  * admitted *pro hac vice*

                                  *Lead Counsel for Plaintiffs*

                                  Bradley S. Wolff, GA No. 773388
                                  SWIFT, CURRIE, MCGHEE, & HIERS, LLP
                                  1420 Peachtree St., NE, Suite 800
                                  Atlanta, GA 30309
                                  Phone: (404) 874-8800
                                  Fax: (404) 888-6199
                                  brad.wolff@swiftcurrie.com

                                  *Local Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to the Civil Local Rules of Practice for the United States District Court for the Northern District of Georgia, this is to certify that the foregoing document complies with the font and point selections approved by the Court in Local Rule 5.1C. The foregoing was prepared on computer using Century Schoolbook font (13 point).

/s/ Andrew D. Schlichter
Attorney for Plaintiffs